1

2

3

4

5

6

7

8

9

10

UNITED STATES  DISTRICT COURT

Northern District of California

San Francisco Division

11 | RONDA D. SUTTON,                          No. C 11-04088 LB

12 |          Plaintiff,                       **ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S**

13 |     v.                                    **MOTION FOR SUMMARY JUDGMENT AND GRANTING IN**

14 | MICHAEL J. ASTRUE, Commissioner of        **PART AND DENYING IN PART**
   | Social Security,                         **DEFENDANT'S CROSS-MOTION**

15 |                                           **FOR SUMMARY JUDGMENT**
   |          Defendant.

16 |                                           **[ECF Nos. 21 and 23]**

17 | _____/

18 |                            **INTRODUCTION**

19 |      Plaintiff Ronda Sutton moves for summary judgment, seeking judicial review of a final decision

20 | by the Commissioner of Social Security denying her Social Security Income ("SSI") disability

21 | benefits for her claimed disability of cervical degenerative disc disorder and exacerbated shoulder

22 | bursitis.  Mem. in Supp. of Pl.'s Mot. for Summ. J., ECF No. 21 ("Pl.'s Mot.").[1]  The Administrative

23 | Law Judge ("ALJ") determined that Ms. Sutton was capable of performing her past relevant work as

24 | a personnel specialist and was not disabled, as defined in the Social Security Act ("SSA") from May

25 | 30, 2008 through the date of the ALJ's decision.  Administrative Record ("AR") 18-19.

26 |      Pursuant to Civil Local Rule 16-5, the matter is deemed submitted for decision without oral

27 | ─────────────────────

28 |      [1] Citations are to the Electronic Case File ("ECF") with pin cites to the electronically-
   | generated page numbers at the top of the document.

*(left margin, vertical text)* UNITED STATES DISTRICT COURT For the Northern District of California

argument.  All parties have consented to the court's jurisdiction.  *See* ECF Nos. 5 & 10.  For the

reasons stated below, the court **GRANTS IN PART** and **DENIES IN PART** Ms. Sutton's motion

for summary judgment, **GRANTS IN PART** and **DENIES IN PART** the Commissioner's cross-

motion for summary judgment, and **REMANDS** this case to the Social Security Administration for

further proceedings.

## PROCEDURAL HISTORY

Ms. Sutton, now 56, applied for SSI disability benefits on July 30, 2008.  AR 11.  She had been

employed previously as a senior personnel specialist at the State Compensation Insurance Fund.  AR

36-37.  She alleged that she had been unable to work since May 30, 2008 on account of her disabling

conditions: her back, neck, and shoulder pain; degenerative disc disease; and osteoarthritis of the

spine.  AR 85.  The Commissioner denied her application initially on November 13, 2008, AR 90,

and upon reconsideration on March 4, 2009, AR 93.  Ms. Sutton timely requested a hearing before

an ALJ on April 28, 2009.  AR 99.  On October 22, 2009, the ALJ conducted an administrative

hearing on Ms. Sutton's case in Dallas, Texas.  AR 32.  Following the hearing, on May 30, 2010, the

ALJ issued its opinion denying Ms. Sutton's application.  AR 11-19.

The ALJ found that, although Ms. Sutton appeared to suffer from the severe impairments of

degenerative disc disease in her cervical/thoracic spine and right shoulder bursitis, her impairments

did not constitute a disability: they did not meet or medically equal any of the listed impairments in

20 C.F.R. Part 404.  *Id.*  Moreover, the ALJ found that Ms. Sutton retains a residual functional

capacity ("RFC") sufficient to sustain competitive employment at the light exertional level, and that

she is still capable of performing her past relevant work as a personnel specialist.  *Id.*  On June 21,

2010,  Ms. Sutton timely requested her review of the hearing decision, AR 7, which the Appeals

Council denied on June 22, 2011, AR 1-3.  On August 9, 2011, Ms. Sutton timely sought judicial

review under 42 U.S.C. § 405(g).  Complaint, ECF No. 1.  Both sides move for summary judgment.

Pl.'s Mot, ECF No. 21; Defendant's Cross Mot. for Summ. J., ECF No. 23 ("Def.'s Mot.").

## LEGAL STANDARD

## I.  STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the

UNITED STATES DISTRICT COURT
For the Northern District of California

1  Commissioner if the plaintiff initiates the suit within 60 days of the decision.  District courts may set

2  aside the Commissioner's denial of benefits only if the ALJ's  "findings are based on legal error or

3  are not supported by substantial evidence in the record as a whole." 42 U.S.C. § 405(g); *Vasquez v.*

4  *Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (quotation omitted). "Substantial evidence means more

5  than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind

6  might accept as adequate to support a conclusion."  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th

7  Cir. 1995).  If the evidence in the administrative record supports both the ALJ's decision and a

8  different outcome, the court must defer to the ALJ's decision and may not substitute its own

9  decision. *See id.*; *accord Tackett v. Apfel*, 180 F.3d 1094, 1097-98 (9th Cir. 1999).

10  **II.  APPLICABLE LAW: FIVE STEPS TO DETERMINE DISABILITY**

11       An SSI claimant is considered disabled if (1) he suffers from a "medically determinable physical

12  or mental impairment which can be expected to result in death or which has lasted or can be

13  expected to last for a continuous period of not less than twelve months," and (2) the "impairment or

14  impairments are of such severity that he is not only unable to do his previous work but cannot,

15  considering his age, education, and work experience, engage in any other kind of substantial gainful

16  work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(A) & (B).

17       The Social Security regulations set out a five-step sequential process for determining whether a

18  claimant is disabled within the meaning of the Social Security Act.  *See* 20 C.F.R. § 404.1520.  The

19  five steps are as follows:

20       **Step One.**  Is the claimant presently working in a substantially gainful activity?  If so, then the
     claimant is "not disabled" and is not entitled to benefits.  If the claimant is not working in a
21   substantially gainful activity, then the claimant's case cannot be resolved at step one, and the
     evaluation proceeds to step two.  *See* 20 C.F.R. § 404.1520(a)(4)(I).
22

23       **Step Two.**  Is the claimant's impairment (or combination of impairments) severe?  If not, the
     claimant is not disabled.  If so, the evaluation proceeds to step three.  *See* 20 C.F.R. §
24   404.1520(a)(4)(ii).

25       **Step Three.**  Does the impairment "meet or equal" one of a list of specified impairments
     described in the regulations?  If so, the claimant is disabled and is entitled to benefits.  If the
26   claimant's impairment does not meet or equal one of the impairments listed in the regulations,
     then the case cannot be resolved at step three, and the evaluation proceeds to step four.  *See* 20
27   C.F.R. § 404.1520(a)(4)(iii).

28       **Step Four.**  Considering the claimant's residual functional capacity, is the claimant able to do
     any work that he or she has done in the past?  If so, then the claimant is not disabled and is not
     entitled to benefits.  If the claimant cannot do any work he or she did in the past, then the case

cannot be resolved at step four, and the case proceeds to the fifth and final step.  *See* 20 C.F.R. § 404.1520(a)(4)(iv).

**Step Five.**  Considering the claimant's residual functional capacity, age, education, and work experience, is the claimant able to "make an adjustment to other work?"  If not, then the claimant is disabled and entitled to benefits.  *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do.  There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.  If the Commissioner meets this burden, the claimant is not disabled.

For steps one through four, the burden of proof is on the claimant.  At step five, the burden shifts to the Commissioner.  *See Tackett*, 180 F.3d at 1098.

### SUMMARY OF RECORD AND ADMINISTRATIVE FINDINGS

This section summarizes (I) the medical evidence in the administrative record, (II) the function and exertion reports in the administrative record, (III) Ms. Sutton's testimony, (IV) the vocational expert's testimony, and (V) the ALJ's findings.

## I. MEDICAL EVIDENCE

### A. Medical Evidence in Year 2006

#### 1. Dr. Laure F. Mazzara (October 31-November 1, 2006)

In a radiology report dated October 31, 2006, Dr. Mazzara reported that she found some straightening of the curvature in Ms. Sutton's spine; narrowing of the intervertebral space at the C6-C7 spinal location; and narrowing of Ms. Sutton's C6-C7 intervertebral neural foramina, particularly on the left-side.  AR 456.  As a result, Dr. Mazzara formed the impression that Ms. Sutton was suffering from degenerative disc disease at C6-C7.  *Id.*

In a radiology report dated November 1, 2006, Dr. Mazzara wrote that Ms. Sutton received an examination procedure on October 31, 2006 that revealed some straightening of the curvature in her spine, narrowing of the intervertebral space at C6-C7, and narrowing of the C6-C7 intervertebral neural foramina, especially on the left-side.  AR 456.  Spurs were demonstrated at all levels.  *Id.*  Again, Dr. Mazzara's impression was that Ms. Sutton suffered from degenerative disc disease at C6-C7.  *Id.*

### B. Medical Evidence in Year 2007

#### 1. Dr. Edward J. Troy (April 27, 2007)

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1    In a letter to the Disability Evaluation Unit dated April 27, 2007, Dr. Troy, an orthopedic

2    surgeon, described the results of a thirty-five minute in-person patient evaluation he conducted with

3    Ms. Sutton on April 18, 2007.  AR 409.  On physical examination, he found her head and neck to be

4    in normal axial alignment.  AR 414.  There was some muscle tenderness detected, but not in her

5    paraspinous muscles.  *Id.*  He did not detect any spasm.  *Id.*  He found symmetrical limitation of the

6    lateral flexion with significant asymmetric limitation of rotation.  *Id.*  He evaluated her biceps,

7    triceps, brachioradialis and finger flexors, and found her deep tendon reflexes to be physiologic and

8    equal.  *Id.*  He evaluated her shoulders and found no evidence of irritability, instability or

9    impingement.  *Id.*  He noticed that she had excellent motor strength and found her range of motion to

10   be symmetrical.  *Id.*  He found her elbow capable of 0-140 degree of flexion bilaterally, and no

11   tenderness over either epicondyle or the ulnar notch.  *Id.*  He found that Ms. Sutton exhibited no

12   evidence of discomfort at the elbow with resisted wrist flexion or extension.  *Id.*  He found her

13   elbow stable, her forearm and wrist motion to be within normal limits and symmetrical, and her

14   hands able to form a fist and fully extend the fingers.  *Id.*  Various tests (e.g., provocative tests, the

15   Grind test, the Finkelstein test, and manual motor tests) all came back negative.  AR 414-15.  Grip

16   testing results appeared normal for a woman of her stature.  AR 415.

17   Dr. Troy formed his impression of Ms. Sutton's medical condition on the basis of patient

18   questionnaires, patient intake, and physical examination.  *Id.*  He did not review any x-rays, special

19   studies, or Ms. Sutton's prior medical records, as none were made available to him.  *Id.*  He did

20   receive an x-ray description created by Dr. Y. N. Choi, dated 10/30/2006, and a series of notes

21   exchanged between Dr. Choi and Ms. Sutton that indicated the following: Dr. Choi diagnosed her

22   with wear-and-tear arthritis or osteoarthritis; explained to her that osteoarthritis usually manifests

23   with age and as a result of prior trauma; advised her to consume over-the-counter drugs containing

24   glucosamine and chondroitin to reduce the pain; and explained that surgery was an available

25   treatment option should the symptoms persist or become sufficiently severe.  *Id.*

26   Based on this information, Dr. Troy believed that Ms. Sutton had cervical osteoarthritis, or

27   osteoarthritis of the neck.  AR 416.  This condition is related to age, genetics, or prior trauma; is a

28   function of the general aging process; likely did not arise as a result of industrial activities; and

UNITED STATES DISTRICT COURT
For the Northern District of California

1  therefore, could not be considered an industrial injury.  *Id.*  Dr. Troy believed Ms. Sutton can show

2  that her work activities aggravated her injury if she can demonstrate some specific activity that is

3  "more provocative than routine activities . . ." (e.g., carrying 100 pound sacks may reasonably

4  aggravate a person's osteoarthritis of the hip).  *Id.*  Dr. Troy also believed that Ms. Sutton could be

5  suffering, additionally or alternatively, from a herniated cervical disc.  *Id.*  He believed that like

6  osteoarthritis of the neck, a herniated cervical disc would also be considered a non-industrial injury

7  absent proof of past work-related injuries to the neck.  *Id.*  Simply sitting at a desk and typing would

8  not be expected to cause a disc herniation.  *Id.*  Dr. Troy stated his need to review Ms. Sutton's

9  x-rays, however, before making a firm diagnosis of her medical condition and its severity.  *Id.*

10        ***2. Dr. Edward J. Troy (August 2, 2007)***

11        In a supplemental report to the Disability Evaluation Unit dated August 2, 2007, Dr. Troy

12  reported that he received Ms. Sutton's October 30, 2006 x-rays shortly after completing his

13  evaluation of Ms. Sutton on April 18, 2007.  AR 316.  These x-rays showed 5 views of Ms. Sutton's

14  cervical spine: an AP, lateral, both obliques and odontoid.  *Id.*  He noted that the x-rays showed Ms.

15  Sutton to be suffering significant multilevel degenerative changes in her spine.  *Id.*  At C6-C7, there

16  was marked intervertebral disc-space narrowing, almost complete loss of the disc space, and mild

17  foraminal encroachment.  AR 316-17.  There was also significant foraminal encroachment caused by

18  the spurring and enlargement of the superior facet of the C6.  AR 317.

19        Dr. Troy noted that the intervertebral space at C6-C7 also underwent straightening, spurring, and

20  narrowing.  *Id.*  In particular, the intervertebral neural foramina at this location underwent narrowing

21  more noticeably.  *Id.*  From these x-rays, Dr. Troy formed the impression that Ms. Sutton suffered

22  advanced degenerative changes to her cervical spine.  *Id.*  He believed these changes were diffuse.

23  *Id.*  He was also of the opinion that they did not suffer result from industrial injury.  *Id.*  He

24  understood her symptoms could flare at work, however, just as they could while she participates in

25  recreational activities, housework, or any work involving overhead reaching.  *Id.*  He believed there

26  was nothing particularly aggravating about her work-related activities.  *Id.*  He found her symptoms

27  to result from an underlying idiopathic process.  *Id.*

28        ***3. Dr. Rose M.Q. Melgar (September 12, 2007 and November 16, 2007)***

UNITED STATES DISTRICT COURT
For the Northern District of California

1    On September 12, 2007, Dr. Melgar submitted a written diagnosis of Ms. Sutton stating that she

2    believed Ms. Sutton suffered cervical strain, diffuse myofascial pain syndrome, and strain in her arm

3    or forearm from repetitive use.  AR 330.  On November 16, 2007, Dr. Melgar updated her diagnosis,

4    stating that she believed Ms. Sutton suffered only cervical strain and diffuse myofascial pain

5    syndrome, and recommended that she receive physical therapy over the course of six visits for a

6    duration of four to six weeks.  AR 332.

7            *4.  Dr. Edward J. Troy (November 5, 2007)*

8            In a letter to the Disability Evaluation Unit dated November 5, 2007, Dr. Troy wrote that Ms.

9    Sutton had asked him to reassess her medical condition after his August 2, 2007 supplemental report

10   because she claimed that Dr. Melgar opined that her injuries originated from work.  AR 405-06.  Dr.

11   Troy suspected Dr. Melgar never actually addressed the issue of medical causation.  AR 406.  Dr.

12   Troy believed that Ms. Sutton herself was holding onto the opinion that her injury was work-related.

13   *Id.*  Dr. Troy believed differently, however, because her injuries - marked degenerative changes with

14   collapse of the C6-C7 intervertebral disc space - as revealed by her x-rays did not appear to result

15   from industrial activities.  *Id.*  He predicted that she could be symptomatic at work, as she could

16   anywhere elsewhere (e.g., while partaking in recreational activities, housework, etc.).  *Id.*

17   Therefore, the mere fact that she did not have a specific injury did not mean that any and all

18   discomfort from her condition would be work-related.  *Id.*  He believed her symptoms would likely

19   be found to result from radiculopathy, foraminal narrowing, and nerve root compression.  *Id.*  But

20   these degenerative changes, in his medical opinion, would only be coincidental to, and not

21   attributable to, industrial activities.  *Id.*

22           *5.  Dr. Daniel Lim (December 19, 2007)*

23           In a report dated December 19, 2007, Dr. Lim noted that he read the following results from

24   images taken of Ms. Sutton's cervical spine.  AR 505.  The cervical cord demonstrated normal

25   signal intensity.  *Id.*  There was no Chiari malformation.  *Id.*  There was normal alignment of

26   cervical spine without spondylolisthesis.  *Id.*  The vertebral bodies appeared normal in height.  *Id.*

27   There was no evidence of any compression fracture.  *Id.*  The bone marrow was normal in signal

28   intensity.  *Id.*

ORDER (C 11-04088 LB)

7

UNITED STATES DISTRICT COURT
For the Northern District of California

1   At the C2-C3 level, however, he did notice mild right uncal vertebral ridging resulting in mild

2   right neural foraminal narrowing.  *Id.*  The central canal and left neural foramen were patent.  *Id.*  At

3   the C3-C4 level, there was mild diffuse posterior disc bulging, associated with mild-to-moderate

4   right and moderate-to-severe left uncal vertebral ridging, resulting in mild central canal narrowing.

5   *Id.*  There also was mild-to-moderate right and moderate-to-severe left neural foraminal narrowing.

6   *Id.*  At the C4-C5 level, there was mild diffuse posterior disc bulging associated with moderate left

7   uncal vertebral ridging, resulting in moderate left neural foraminal narrowing.  *Id.*  The central canal

8   and right neural foramina were also patent.  *Id.*  At the C6-C7 level, there was mild-to-moderate

9   diffuse posterior disc bulging, associated with mild right and moderate left uncal vertebral ridging,

10  resulting in mild central canal narrowing, and mild right and moderate left neural foraminal

11  narrowing.  *Id.*  The remainder of the cervical spine demonstrated no disc bulging, protrusion,

12  central canal or neural foraminal narrowing.  *Id.*  Therefore, Dr. Lim's impression was that Ms.

13  Sutton suffered from degenerative disc disease at the C2-3, C3-4, C4-5, and C6-7 levels, with the

14  most severe being at the C3-4 level.  *Id.*  He noticed also that there was moderate-to-severe left

15  neural foraminal narrowing at this level as well.  *Id.*

16  **C.  Medical Evidence in Year 2008**

17      ***1.  Dr. Edward J. Troy (February 26, 2008)***

18  In a report dated February 26, 2008, Dr. Troy wrote that he conducted another 45-minute

19  in-person evaluation of Ms. Sutton on February 8, 2008.  AR 361.  From his prior evaluations, he

20  believed Ms. Sutton suffered from advanced widespread degenerative disease in her cervical spine

21  with almost complete collapse at C6-C7.  AR 362.  He also had the strong impression that she

22  suffered severe advanced idiopathic cervical degenerative disc disease, not of industrial origin but

23  equally symptomatic irrespective of industrial exposure.  *Id.*  Ms. Sutton stated that, after reviewing

24  Dr. Troy's reports, Dr. Melgar changed the diagnosis of her condition.  *Id.*  Dr. Troy had not

25  received any documents corroborating this assertion.  *Id.*

26  Ms. Sutton also alleged that she was consulting with Dr. Choi on an as-needed basis.  AR 363.

27  She allegedly was taking Motrin twice a day which she found beneficial.  *Id.*  She was not receiving

28  any physical therapy.  *Id.*

ORDER (C 11-04088 LB)

8

1     On physical examination, Dr. Troy noted that Ms. Sutton's posture was satisfactory.  AR 365.

2   She had tenderness along her paraspinous muscles.  *Id.*  Her cervical motion showed restriction,

3   particularly with extension and 50% of lateral flexion.  *Id.*  She also suffered from an approximately

4   50% loss of left lateral flexion.  *Id.*  She was able to forward flex 50 degrees and extend 25 degrees.

5   *Id.*  Axial compression did not appear to elicit any discomfort.  *Id.*  The Spurling test tested positive

6   bilaterally for pain radiating to her trapezius.  *Id.*  Sensation was slightly decreased in her fingers

7   and along the radial border of her right arm.  *Id.*  Her deep tendon reflexes were symmetrical, her

8   biceps and triceps were physiologic, and her brachioradialis and finger flexors were slightly

9   depressed.  AR 366.  Manual motor testing revealed no evidence of focal motor weakness.  *Id.*

10    Since his previous evaluation of Ms. Sutton, Dr. Troy had received and reviewed several

11   documents from other doctors respecting Ms. Sutton's condition.  *Id.*  On September 14, 2007, Dr.

12   Stephen Carver diagnosed her with cervicothoracic repetitive sprain and strain with associated

13   myofasciitis and radiculopathy.  *Id.*  On October 1, 2007, Dr. Carvin noted that her pain level had

14   decreased and she had since returned to full-time regular work.  AR 367.  On December 10, 2007,

15   Dr. Melgar reported that Ms. Sutton visited a chiropractor for several weeks and was feeling better

16   as a result, but stopped after several visits because her insurance allegedly stopped authorizing

17   payment on additional chiropractor sessions.  *Id.*  As a result, Ms. Sutton began to feel increased

18   pain in her neck, trapezius, upper and mid back, and occasional numbness in either hand without a

19   clear discernible pattern.  *Id.*  Dr. Melgar advised her to work 4 hours a day, 20 hours a week; keep

20   her activities at eye level; and refrain from prolonged positioning of her head or any repetitive use of

21   her arms or hands.  *Id.*

22    Dr. Troy diagnosed her with multilevel advanced degenerative spondylosis and cervical disc

23   disease.  *Id.*  He noted that this disease has a very high genetic component.  *Id.*  He believed her job

24   neither created nor exacerbated the problem.  *Id.*  She would be symptomatic, irrespective of her

25   activities.  *Id.*  Because her degenerative changes were so severe, he understood that she would be

26   symptomatic, regardless of whether she were performing housework, bowling, or merely sitting at

27   her desk.  *Id.*  He supported Dr. Melgar's recommendations to receive electrodiagnostic studies

28   (MRI) to learn more about her condition.  *Id.*  He believed that the likely treatment option would be

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1   surgical intervention.  AR 368.  He also believed intervention should be self-procured on a

2   non-industrial basis, however, because her condition appeared to be entirely non-industrial.  *Id.*  He

3   found epidemiologic studies to show a high hereditary component, and an absence of any work-

4   related etiologic factors, for this problem.  *Id.*  Based on his assessment of the reasonable medical

5   probabilities, Dr. Troy would apportion 100% of her impairment to non-industrial factors and 0% to

6   industrial activities.  *Id.*

7   **2.  Dr. Will A. North (June 13, 2008)**

8   In a progress note dated June 13, 2008, Dr. North documented his June 11, 2008 medical

9   evaluation of Ms. Sutton.  AR 445.  Dr. North reported speaking with Ms. Sutton about the pain in

10   her neck and arms which she allegedly began suffering in the two years prior to her retirement.  *Id.*

11   He found that MRI imaging had not disclosed any multilevel diseases.  *Id.*  From his review of

12   relevant systems, he found no abnormal sensations in her legs or abnormalities in her bowel or

13   bladder functions.  *Id.*  He found her to be alert and comfortable, exhibiting no weakness in her

14   upper or lower limbs, and capable of walking without assistance throughout the clinic examination.

15   *Id.*  Dr. North advised Ms. Sutton that he found no surgical disease in her neck, and recommended

16   for her a program of dedicated spinal stretching and aerobics.  *Id.*  Because of her background in

17   exercise, he was confident his prescribed fitness program would be effective for her.  *Id.*

18   **3.  Drs. Srinivas R. Ramachandra and Young Me Choi Do (July 11-22, 2008)**

19   On July 11, 2008, Dr. Ramachandra removed a 3 cm. sebaceous cyst on Ms. Sutton's right upper

20   back.  AR 492.  Ms. Sutton allegedly had the cyst for several years, but it had become tender and

21   painful, and so she requested that it be removed.  *Id.*  Dr. Ramachandra surgically removed the cyst

22   and asked that she return in three days for a follow-up.  *Id.*  During her follow-up appointment on

23   July 14, 2008, Dr. Ramachandra reported that the wound appeared clean, the sutures were intact, and

24   there was no evidence of infection.  AR 493.  On July 22, 2008, Ms. Sutton consulted Dr. Young Me

25   Choi Do for shoulder pain: her shoulder hurt when she raised her arms.  AR 494.  As a result, Dr. Do

26   injected her with 40 mg of "depo" and 7 cc of lidocaine to treat the pain.  *Id.*  It is not clear from the

27   record, however, whether the shoulder pain was related to her cyst removal or to the bursitis

28   affecting her shoulder.  *See generally* AR 493-94.

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

UNITED STATES DISTRICT COURT
For the Northern District of California

### 4. Dr. Calvin Pon (October 14, 2008)

In a residual functional capacity assessment dated October 14, 2008, Dr. Calvin Pon wrote his review of Ms. Sutton's medical records at the request of the Social Security Administration. AR 460. Dr. Pon observed Ms. Sutton sitting in the waiting room comfortably. AR 461. He noted that she was able to get up and walk to the exam room; ambulate with no apparent need for any ambulatory aid; and her gait appeared normal with normal cadence, velocity, and stride length. *Id.* He did not detect any presence of limping. *Id.*

With respect to her upper extremities, Ms. Sutton demonstrated on physical examination that she was able to forward flex and abduct both shoulders to 150 degrees. *Id.* She was able to make a fist normally with both hands. *Id.* There were no joint deformities or muscular atrophy noted bilaterally. *Id.* Fine finger movements were intact bilaterally. *Id.* Ms. Sutton was able to write legibly with her right hand and pick up a coin normally with both hands. *Id.*

With respect to her lower extremities, Ms. Sutton demonstrated on physical examination that she was able to extend both hips to neutral and fully flex both hips. *Id.* There were also no joint deformities noted bilaterally. *Id.* Dr. Pon noted that Ms. Sutton complained of associated bilateral upper extremity numbness. *Id.* On today's physical examination, however, there was no hard, objective evidence of any cervical nerve root impingement. *Id.* Dr. Pon also noted that Ms. Sutton did not have any past nerve damage in her electrodiagnostic study (MRI) results. *Id.*

With respect to her functional capacity assessment, Dr. Pon noted that Ms. Sutton should experience no restriction in sitting, standing, or walking. AR 462. He believed that she should stoop only on occasion. *Id.* He also found that she should have no restriction in crouching, kneeling, squatting, stair-climbing, ladder-climbing, or crawling. *Id.* In spite of her complaint of bilateral upper extremity numbness, Dr. Pon believed she should still be able to perform bilateral pushing and pulling, and exhibit arm/hand control on a frequent basis. *Id.* She should experience no restriction in performing bilateral pushing, leg/foot control. *Id.* He also found her to able to lift and carry 10 pounds frequently and 20 pounds occasionally. *Id.* He found no limitations in her ability to reach bilaterally or in her ability to perform gross and fine manipulative tasks with both hands. *Id.*

### 5. Dr. T. Nguyen (November 3, 2008)

UNITED STATES DISTRICT COURT
For the Northern District of California

1    In a residual functional capacity assessment form dated November 3, 2008, Dr. Nguyen recorded

2   the following observations of Ms. Sutton's exertional limitations: Ms. Sutton could occasionally lift

3   or carry 20 pounds, and frequently lift or carry 10 pounds; she could stand or walk with normal

4   breaks for a total of about 6 hours in an 8 hour workday; she could sit with normal breaks for a total

5   of about 6 hours in an 8 hour workday; and her push/pull capacity would be unlimited in both her

6   upper and lower extremities.  AR 519-20.  Respecting Ms. Sutton's postural limitations, Dr. Nguyen

7   found that she could occasionally climb ramps and stairs but not ladders, ropes, or scaffolds; she

8   could frequently balance, stoop, kneel, and crouch; and she could occasionally crawl.  AR 520-21.

9   And respecting Ms. Sutton's manipulative limitations, Dr. Nguyen observed that her ability to reach

10  in all directions (including overhead) was limited; however, her handling, fingering, and feeling

11  capacities were unlimited.  AR 521.  Dr. Nguyen further noted that the severity of Ms. Sutton's

12  symptoms and their alleged effects on her ability to function were consistent with the totality of the

13  medical and non-medical evidence.  AR 523.

14       *6. Dr. Faith Tobias (November 10, 2008)*

15   In a mental status disability evaluation that the Department of Social Services appeared to

16  receive on November 10, 2008, Dr. Tobias, psychologist, reported her findings with respect to Ms.

17  Sutton's mental health.  AR 510-11.  Dr. Tobias observed that Ms. Sutton appeared alert and

18  oriented to the person, place, time, and situation; she demonstrated adequate attention and

19  concentration; her speech was clear and coherent; her receptive language skills were within normal

20  range; she had an adequate fund of information to respond to evaluation questions; she exhibited

21  abstract reasoning; her remote memory was intact; her thought process was linear and coherent, and

22  her thought content was logical; and she exhibited adequate insight and judgment.  AR 512.

23  Applying the Folstein Mini Mental State Examination, Dr. Tobias found that Ms. Sutton fell within

24  the normal range.  AR 513.

25   In evaluating the psychological aspects of Ms. Sutton's work-related abilities, Dr. Tobias found

26  Ms. Sutton did not exhibit any level of impairment with respect to the following: following or

27  remembering instructions, simple or complex/detailed; maintaining adequate pace or persistence to

28  perform repetitive or complex tasks; maintaining adequate attention or concentration; adapting to

changes in job routine; withstanding the stress of a routine work day; maintaining emotional stability or predictability; and interacting appropriately with co-workers, supervisors, and the public on a regular basis. *Id.* From this, Dr. Tobias concluded that Ms. Sutton's main obstacle to adequate work performance appeared to be her medical condition and not her psychological condition. *Id.* Ms Sutton's medical condition was beyond the scope of Dr. Tobias's evaluation. *Id.*

### 7. Dr. T. Walk (November 12, 2008)

In a psychological evaluation with Ms. Sutton dated November 12, 2008, Dr. Walk found that Ms. Sutton had a history of depression and was currently suffering pain secondary to physical symptoms. AR 535-37. Dr. Walk noted that Ms. Sutton's depression varied with her pain. *Id.* Dr. Walk further noted that there were no "Y Tx or Rx" or "Y Diagnosis or MSS." *Id.* As a result, Dr. Walk concluded that Ms. Sutton had no medically determinable impairment from a psychological standpoint. *Id.*

### D. Medical Evidence in Year 2009

#### 1. Hanus Chiropractic (January 16, 2009 - February 25, 2009)

In medical records covering the period from January 16, 2009 to February 25, 2009, treating professionals from Hanus Chiropractic diagnosed Ms. Sutton with cervical neuralgia problems. AR 555. They noted that Ms. Sutton expressed a reluctance to resort to surgery or to rely on narcotics for pain management. AR 553. They appeared to prescribe Ms. Sutton a regular program of "active rehab," "resistance rehab," and "recumbent bike" throughout the course of their therapy sessions to improve her strength and mobility. AR 550-54. Furthermore, they appeared to recommend Ms. Sutton to use a new pillow "for support at night to neck" which they reported, in subsequent meetings, were helpful for her. AR 552-53. They reported that Ms. Sutton appeared to exhibit progress in pain management over the course of their treatment, as indicated by notations of 3/10 and 4/10 on a normative pain scale regarding the pain that she felt in her neck and spine. *Id.* Near the end of their therapy sessions, however, they noted that Ms. Sutton still appeared to experience "pain on tilt and extension" and continued to exhibit some right cervical neuralgia and radiculopathy problems. AR 550. They recommended that Ms. Sutton schedule an appointment for an orthopedic evaluation to "rule out surgical needs." *Id.*

UNITED STATES DISTRICT COURT
For the Northern District of California

### 2. *Dr. Leigh McCrary (March 3, 2009)*

In a separate residual functional capacity assessment form dated March 3, 2009, Dr. McCrary found results similar to Dr. Nguyen's findings regarding Ms. Sutton's exertional limitations. AR 540; *see also* AR 519-20. Dr. McCrary sourced her conclusions to a "10/14/08 CE report," which noted that Ms. Sutton faced no restrictions in standing, walking, or sitting; was limited to lifting/carrying 10 pounds frequently and 20 pounds occasionally; and experienced no restriction in pushing/pulling or operating hand/foot controls. AR 540. Dr. McCrary also found results similar to Dr. Nguyen's findings regarding Ms. Sutton's postural limitations. AR 541; *see also* AR 520-21. Dr. McCrary cited again as the basis for her findings the "10/14/08 CE report" which found that Ms. Sutton should stoop only on occasion, and that she should experience no restriction in crouching, kneeling, squatting, stair-climbing, ladder-climbing, or crawling. AR 541. Additionally, Dr. McCrary found similar results with respect to Dr. Nguyen's findings on Ms. Sutton's manipulative limitations. AR 542; *see also* AR 521. She cited again as the basis for her conclusions, the "10/14/08 CE report" that stated Ms. Sutton had full range of movement in her bilateral shoulders, elbows and wrists; suffered no joint deformities; was able to make a normal fist with both hands; had normal muscle strength, grip strength, and fine finger control; and was able to handle small objects and write without difficulty. AR 542. Ms. Sutton's only manipulative limitation as identified in the 10/14/2008 CE was her limited ability to reach overhead due to the severity of the degenerative disc disease in her neck. *Id.* Based on these findings, Dr. McCrary believed Ms. Sutton's alleged limitations were not fully consistent with the EOR and, therefore, not fully credible. AR 544.

### 3. *Dr. Benzel C. MacMaster (March 9-16, 2009)*

In a report dated March 9, 2009, Dr. MacMaster (who Ms. Sutton alleges to be her treating physician, *see* Pl.'s Mot., ECF No. 21 at 22-27) recorded the results of a March 6, 2009 physical examination that he conducted on Ms. Sutton. AR 578. Examination of her spine revealed an absence of abnormal curvatures and deformities in her cervical spine. AR 580. Examination of her shoulders revealed an absence of asymmetry, ecchymosis, soft tissue swelling, and deformity in her shoulder girdle; an absence of atrophy in her shoulder musculature; and an absence of any

1 dislocation, subluxation, or laxity in her shoulder. *Id.* And examination of her arms revealed an

2 absence of soft tissue swelling, masses, or deformities in her arm; and an absence of atrophy or

3 deformities in her biceps, triceps, and brachialis muscles. *Id.* As a result, he diagnosed Ms. Sutton

4 with chronic and exacerbated cervical radiculitis on her left, and exacerbated bursitis in her right

5 shoulder region. AR 581. He recommended that Ms. Sutton undergo an MRI scan of her spinal

6 canal, cervix, and joints in her upper extremities, and an EMG study of her paraspinal area. *Id.*

7 Similarly, in a report dated March 16, 2009, Dr. MacMaster recorded the results of a March 13,

8 2009 physical examination that he conducted on Ms. Sutton. AR 575. Again, Dr. MacMaster found

9 no abnormal curvature or deformity in her cervical spine, or masses, spasms, or specific trigger

10 points in her cervical spine musculature. AR 576. He noted, however, that Ms. Sutton felt pain and

11 exhibited tenderness at her C4-C7 spinal region. *Id.* He also found no asymmetry, ecchymosis, soft

12 tissue swelling, or deformity in her shoulder girdle; no atrophy in her shoulder musculature; and no

13 dislocation, subluxation, or laxity in her shoulder. *Id.* He did find some tenderness over her deltoid

14 insertion. *Id.* Ms. Sutton's C-Spine MRI revealed multilevel foraminal stenosis at C3-C4, C5-C6,

15 C6-C7, and C7-T1; mild central stenosis at C3-C4 and C6-C7; and mild anterolisthesis at C3-C4 and

16 C7-T1. AR 577. Her right shoulder MRI revealed A-C arthrosis with overgrowth impinging on her

17 cuff, and tendinitis of her supraspinatus and infraspinatus tendons on her bursal surfaces. *Id.* As a

18 result of his assessment, Dr. MacMaster diagnosed Ms. Sutton with chronic and exacerbated

19 multilevel spinal stenosis in her cervical region, and exacerbated bursitis in her right shoulder

20 region. *Id.* He treated her by injecting her with 2 cc of Celestone into her subacromial/subdeltoid

21 bursa. *Id.*

22 ### 4. Drs. Scott A. Bundy and James P. Pak (*March 9, 2009*)

23 On March 9, 2009, following her concerns of neck pain and cervical radiculopathy, Ms. Sutton

24 received an MRI study of her cervical spine. AR 559. Dr. Bundy, the neuroradiologist who read her

25 MRI study, found straightening in her cervical spine accompanied by loss of normal lordosis. AR

26 559. He found no definite intrinsic cord lesions. *Id.* From C2-C3 there was mild-to-moderate right

27 neural foraminal stenosis. *Id.* From C3-C4, there was subtle grade 1 anterolisthesis, mild

28 spondylosis, and degenerative disc disease with a shallow annular bulge, mild central canal stenosis

1  without cord compression, and neural foraminal stenosis.  *Id.*  From C4-C5, there was

2  mild-to-moderate spondylosis and degenerative disc disease with a shallow annular bulge and neural

3  foraminal stenosis.  AR 560.  From C5-C6, there was moderate spondylosis and degenerative disc

4  disease with shallow diffuse bulging of the annulus, and neural foraminal stenosis.  *Id.*  From C7-T1,

5  there was moderate-to-advanced bilateral facet arthropathy, mild degenerate disc disease, no central

6  canal stenosis or cord compression, and neural foraminal stenosis.  *Id.*  From T1-T2, there was subtle

7  anterolisthesis, mild-to-moderate bilateral facet arthropathy, endplate spondylosis, degenerative disc

8  disease, mild central canal stenosis, and moderate neural foraminal stenosis.  *Id.*  From T2-T3, there

9  was endplate spondylosis and degenerate disc disease, mild central canal stenosis, and neural

10  foraminal stenosis.  *Id.*  And from T3-T4, there was endplate spondylosis and degenerative disc

11  disease without cord compression, borderline central canal stenosis, and neural foraminal stenosis.

12  *Id.*

13     Dr. Pak, a radiologist who also read her study, found the images showed mild-to-moderate

14  degenerative arthrosis of her AC joint.  AR 564.  He also found capsular hypertrophy and small sub-

15  surface spur formations that were likely causing encroachment and mild mass effect on her

16  supraspinatus outlet.  *Id.*  Furthermore, he found edema throughout the bursal surface of her

17  supraspinatus tendon, which is consistent with a finding of tendinitis.  *Id.*  Her infraspinatus tendon

18  also showed mild tendinitis, and her teres minor and subscapularis tendons were intact.  *Id.*  He did

19  not find any evidence of a tear.  *Id.*  His impression was that Ms. Sutton was suffering from AC joint

20  arthropathy, which likely was the cause of her nerve impingement, and supraspinatus and

21  infraspinatus bursal surface tendinitis, but without evidence of any tear.

22     ### 5. *Dr. Radie F. Perry (March 10, 2009)*

23     In a letter dated March 10, 2009, Dr. Perry wrote to Dr. MacMaster to confirm that she

24  conducted electrophysiological testing of Ms. Sutton's left upper extremity at his request.  AR 568.

25  After conducting both physical examination and electrodiagnostics on Ms. Sutton, Dr. Perry formed

26  the following impression: there was no conclusive evidence of cervical radiculopathy or plexopathy

27  from the normal EMG/nerve conduction study that she performed.  AR 570.  Moreover, she did not

28  find any evidence of peripheral entrapment from the normal median and ulnar nerve conduction

UNITED STATES DISTRICT COURT
For the Northern District of California

1    studies that she performed.  *Id.*

2              **6.  Dr. Benzel C. MacMaster (September 18-22, 2009)**

3         In a report dated September 18, 2009, Dr. MacMaster reported the following results from a

4    physical examination that he conducted on Ms. Sutton earlier on September 15, 2009.  AR 597.  On

5    examination, he found her cervical spine showed no abnormal curvatures or deformities, but she

6    experienced pain and tenderness at the spinous processes from C4-C7.  AR 598.  Furthermore, he

7    found no asymmetry, ecchymosis, soft tissue swelling, or deformity in her shoulder girdle.  *Id.*  He

8    also noted crepitus in her subacromial area, tenderness over her anterior acromial process,

9    tenderness in her supraspinatus tendon insertion when her shoulder was in extension, and tenderness

10   in her deltoid insertion.  *Id.*  He also found moderate restriction of motion in flexion, abduction, and

11   internal and external rotation.  *Id.*  He diagnosed her as suffering chronic and stable multilevel spinal

12   stenosis in her cervical region and exacerbated bursitis in her right shoulder region.  AR 599.  He

13   treated her symptoms by injecting 2 cc of Celestone into her subacromial/subdeltoid bursa.  *Id.*

14        In his physician's medical source statement dated September 22, 2009, Dr. MacMaster reported

15   the following observations.  AR 592-93.  Ms. Sutton's first appointment with Dr. MacMaster was on

16   March 6, 2009.  *Id.*  He had diagnosed her with chronic spinal stenosis in her cervical region, and

17   exacerbated bursitis in her right shoulder.  *Id.*  She complained of constant cervical pain and

18   shoulder pain.  *Id.*  The objective findings that established Ms. Sutton's degenerative impairments

19   were her C-spine MRI scans that showed multilevel foraminal stenosis at the C3-C4, C5-C6, C6-C7,

20   and C7-T1 regions.  *Id.*  On September 15, 2009, Dr. MacMaster administered an injection of

21   Celestone into her right shoulder.  *Id.*  Ms. Sutton's impairments lasted or were expected to last at

22   least 12 months.  *Id.*  Ms. Sutton's pain experience was constant and severe enough to interfere with

23   her attention and concentration on even simple work tasks.  AR 593.  Nevertheless, Dr. MacMaster

24   did not test for functional limitations and did not offer any opinion as to Ms. Sutton's functional

25   limitations.  *Id.*  Even though Ms. Sutton first consulted him on March 6, 2009, Dr. MacMaster was

26   confident that her disability could have reasonably started on May 30, 2007.  AR 594.

27   **II.  FUNCTION AND EXERTION REPORTS**

28        **A.  Ms. Ronda D. Sutton's Function Report (September 3, 2008)**

1    In a function report dated September 3, 2008, Ms. Sutton recorded the following observations.

2    AR 187.  In describing her typical day from start to finish, she said that she would usually sleep the

3    night before for about two to three hours, after which she would slowly get out of bed clutching her

4    left shoulder, which would likely be in the worst pain.  *Id.*  The left side of her neck would "bulge[]"

5    out and feel stiff and sore.  *Id.*  All day, this pain would be agonizing, continuous and severe and

6    would interfere with her ability to perform any activity.  *Id.*  She would sit and lay on her right side

7    for over half the day.  *Id.*  Her husband would assist significantly with escorting their daughter to

8    and from school.  *Id.*  She stated that she required her husband's assistance to take care of their

9    daughter.  She did not clearly state the extent of her husband's assistance.  *See generally* AR 188.

10   Before her injury, she was able to walk 3-5 miles a day, exercise using her arms, including over

11   the shoulder type exercises, and write all day without pain.  *Id.*  Her injury affected her sleep, as it

12   would wake her up at all hours of the night.  *Id.*  To help her sleep, she would place a water pillow

13   under her neck and shoulders.  *Id.*  Describing how the injury had affected her ability to care for

14   herself, she stated that she had difficulty zipping into her dresses without assistance, and must

15   proceed very slowly in inserting her arms into her sleeves.  *Id.*

16   She still was able to prepare her own meals, but only cereal and sandwiches.  AR 189.

17   Otherwise, her husband had to prepare the meal.  *Id.*  It would take her approximately 2-3 minutes to

18   prepare her meals.  *Id.*  Prior to the onset of her injury, she was able to prepare all of her meals on

19   her own.  *Id.*  With respect to household chores, she recently began receiving a church member's

20   assistance.  *Id.*  She could not complete house or yard work on her own because the pain in her

21   shoulders was too severe.  AR 190.

22   She would leave her home maybe once or twice a week.  *Id.*  During those times, she would

23   drive a car.  *Id.*  She still was able to shop in stores.  *Id.*  The items she would usually shop for

24   include household items and school clothes for her daughter.  *Id.*  She still was able to manage

25   money, including paying bills, counting change, using a savings account, and using a checkbook and

26   money orders.  *Id.*  Her injury did not affect her ability to handle money.  AR 191.

27   Despite her injury, she still was able to spend time with others, primarily by speaking with them

28   on the phone once or twice a week.  *Id.*  She also visited church on a regular basis (about twice a

UNITED STATES DISTRICT COURT
For the Northern District of California

1   week).  *Id.*  Nevertheless, she noted that her injury had prevented her from visiting the church as

2   frequently as she would like.  AR 192.

3   Her injury had adversely affected her ability to lift, squat, bend, reach, walk, sit, or stair-climb,

4   as well as her memory, her ability to complete tasks, her concentration, and the use of her hands.  *Id.*

5   Since the onset of her injury, she had only been able to lift 3 or 4 pounds and walk half a mile before

6   requiring rest.  *Id.*  She could also concentrate only for approximately 30 minutes as a result of her

7   injury.  *Id.*  She was no longer able to complete activities on account of her pain.  *Id.*  She could still

8   follow directions but her pain would create some interference.  *Id.*  She still was able to get along

9   well with authority figures, cope with stress, and cope with changes in routine.  AR 193.

10  Nonetheless, she noticed that she had become increasingly short-tempered due to her pain.  *Id.*

11  She did not require the use of ambulatory aids.  *Id.*  She would take medications regularly, which

12  would cause drowsiness.  AR 194.  As a result, she would usually have to lay down for a two hour

13  nap in the middle of the day.  *Id.*  Her husband usually would prepare a light dinner at about

14  6:00 p.m. while she would assist her daughter with her reading assignments.  *Id.*  The family would

15  retire for the evening at about 9:30 p.m.  *Id.*  She usually would be unable to fall asleep until after

16  11:00 p.m. because she would still be in pain and unable to get into a comfortable position.  *Id.*

17  **B. Mr. Samuel B. Sutton's Third-Party Function Report (September 3, 2008)**

18  In a third-party function report, dated September 3, 2008, Mr. Sutton (Ms. Sutton's husband)

19  reported the following observations.  AR 195.  At the time when he completed the report, he had

20  known Ms. Sutton for thirty years and they would do "[almost] everything" together.  *Id.*  He

21  reported that Ms. Sutton's day would usually begin with her assisting him with their daughter for

22  school, and then she would take her medication and try to relax during the day.  *Id.*  He would

23  prepare dinner most days and pick up their daughter from school because Ms. Sutton usually would

24  be in too much pain to perform those duties.  *Id.*  Before her injury, Ms. Sutton was able to "totally

25  care" for their daughter as well as go to work.  AR 196.  Her injury affected her ability to go to

26  sleep, as she would wake two to three times a night tossing and turning.  *Id.*  He would help her zip

27  into her dresses, and clean her back when she was bathing because she was unable to perform these

28  tasks on her own.  *Id.*  Ms. Sutton still was able to prepare small meals on her own (e.g.,

1    sandwiches); nonetheless, he would prepare most meals.  AR 197.  Before her injury, Ms. Sutton

2    used to cook most of the time.  *Id.*  Ms. Sutton still was able to perform the following household

3    chores: light cleaning with short breaks (which would ultimately take her over 30 minutes to

4    complete).  *Id.*  She would be unable to perform house or yard work most of the time because she

5    would be in severe pain.  AR 198.

6        Ms. Sutton would go outside a couple times a day to stay mobile.  *Id.*  Whenever she traveled

7    outside, she would usually drive.  *Id.*  He believed she still was able to shop by mail and computer.

8    *Id.*  She would shop primarily for household items for about 10-15 minutes.  *Id.*  She still was able to

9    pay bills, count change, handle a savings account, and use a checkbook/money orders.  *Id.*  Her

10   injury had not affected her ability to handle money.  AR 199.

11       Ms. Sutton's hobbies were reading, which she still was able to do reasonably well.  *Id.*  She used

12   to read longer hours, but her injury had affected her concentration.  *Id.*  She still was able to spend

13   time with others, mostly at church.  *Id.*  She would visit church at least once a week.  *Id.*

14   Nonetheless, her injury did affect her ability to socialize consistently.  AR 200.

15       Her injury also adversely affected her ability to accomplish the following: lift, bend, reach, sit,

16   and stair-climb.  *Id.*  Her injury also affected her memory on occasion, her ability to complete tasks,

17   her concentration, and the use of her hands.  *Id.*  She could lift only several pounds at a time and

18   could walk for only about half a mile with rest periods.  *Id.*  She could walk a couple of blocks

19   before requiring rest.  *Id.*  She could pay attention to a single task for about 20 minutes at a time.  *Id.*

20   She still was able to follow instructions very well.  *Id.*  She still was able to get along with authority

21   figures very well.  AR 201.  He noticed she had been having difficulty handling stress on account of

22   her pain: she would be "really edgy . . . and short tempered."  *Id.*  He noticed the pain had affected

23   her motivation to accomplish tasks.  *Id.*  She was constantly talking about her pain.  *Id.*

24       He believed Ms. Sutton was no longer the same person following the onset of her injury.  AR

25   202.  Since then, he had to assist her with almost everything, despite being disabled himself.  *Id.*

26   Her injury also complicated their ability to care for their daughter.  *Id.*

27   **C.  Ms. Sutton's Exertion Questionnaire (September 3, 2008)**

28       In an exertion questionnaire, dated September 3, 2008, Ms. Sutton recorded the following

UNITED STATES DISTRICT COURT
For the Northern District of California

observations. AR 204. Describing her symptoms, Ms. Sutton stated that she had been extremely distracted by the pain and weakness in her upper extremities, and by the numbness and tingling sensation running down her right arm (in addition to the drowsiness and dizziness resulting from her medication). *Id.* Describing her typical activities, she stated that when she awakes, she would often be stiff and unable to turn from side-to-side without severe pain. *Id.* Furthermore, she would move throughout the day at a slower pace. *Id.* There were some activities that she would not be able to perform on her own (e.g., her husband had to assist their daughter to school). *Id.* She said she could walk about 0.5 miles over 10-15 minutes. *Id.* After walking, however, she would notice a tightness in her chest (especially on the left side of her body). *Id.* She could no longer climb stairs. AR 205. She could lift only kitchen pots, clothing, and small grocery bags weighing two to three pounds or lighter about two or three times a week. *Id.* She still could carry small cleaning products and laundered clothes back to their clothing drawers about three times a week. *Id.* She could no longer shop for groceries or clean her home or living area on her own. *Id.* She could still drive an automatic car for approximately 30 minutes at a time. *Id.* She could not perform any car maintenance or yard work. *Id.* Before the onset of her disability, she could perform these chores on her own. AR 206. Following her disability, however, she could perform them only sparingly, and at a much slower pace on account of her constant pain. *Id.* She would have difficulty completing housework and other chores. *Id.* She would perform them very slowly. *Id.* For example, after placing dishes in the dishwasher, she would require at least a 15-minute rest period because she would be in pain every time she moved. *Id.* She received approximately four to five hours of sleep (on and off). *Id.* She required a one-hour nap during the day. *Id.* At the time, she was taking Nortriptyline twice a night (for pain and depression), Etodolac twice a day (for inflammation), and Hydrocodone/Vicodine (for severe pain), along with other medications unrelated to her spinal condition. *Id.* She did not need to use any ambulatory devices; she simply walked slower. *Id.* She stated that her degenerative disc disease left her with constant severe pain in her neck and shoulders. *Id.* She believed this was caused by her loss of cartilage. *Id.* The only time when she would experience some relief from the pain was whenever she happened to sleep uninterrupted. *Id.*

**III. MS. SUTTON'S TESTIMONY**

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1    Ms. Sutton stopped working on or around May 30, 2008 because of her neck injury.  AR 36.  At

2    the time, she was performing clerical work as a senior personnel specialist at the State

3    Compensation Insurance Fund.  AR 36-37.  She estimated that 80% of her work consisted of

4    inputting disability cases into organization's computer system, and the remaining 20% consisted of

5    conducting telephonic meetings with disabled clients.  AR 37.  She held this job for 25 years.  *Id.*

6    She usually earned $4,068 per month.  AR 38.  In her highest earning year, she earned

7    approximately $57,000.  *Id.*  The reason she left her job was due to her ongoing, cumulative injury

8    (as opposed to a single, traumatic injury).  AR 38-39.  Around the time when she stopped working,

9    she faced severe neck and shoulder pain that would become unbearable.  AR 40.  Her hands would

10   tingle and go numb 2 or 3 times a day.  *Id.*  Moreover, she would suffer pain in her neck and

11   shoulders area.  *Id.*  Her pain would interfere with her work duties because it would force her to get

12   up and move around to avoid stiffness.  AR 41.  Even if she were placed in a job that would not

13   require her to look at a computer for as long a time, she would still be unable to perform the job

14   because of the pain.  AR 42.  She knew of no alternative positions in her workplace that would have

15   allowed her to avoid the pain.  *Id.*  Moreover, the nature of her work would require her to constantly

16   turn her head because of all the files around her, and to lift files weighing anywhere between 10-20

17   pounds.  AR 43.  She would also have to reach up, above shoulder height, to access file cabinets.  *Id.*

18   The doctor in the administration of her retirement system advised her to discontinue working at the

19   job.  *Id.*  She retired at age 50 on account of the pain, but otherwise she would have retired at either

20   55 or 60.  AR 44.  Since quitting her job, her pain level had gotten worse.  *Id.*  In her living situation,

21   her aunt took care of all their daily needs (e.g., meals, taking her daughter to and from school).  AR

22   45.  Additionally, her daughter was very self-sufficient.  *Id.*  Ms. Sutton admitted to contributing

23   very little to their household.  AR 45-46.  After her daughter would leave for school, she would lay

24   down in a position in which she was comfortable, watch television occasionally, and then

25   periodically walk from room to room.  AR 46.  She suffered moderate cabin fever from stopping

26   work entirely after a 20+ year career.  *Id.*  Most of her attention, however, was paid to managing her

27   pain.  *Id.*  She received cortisone injections, which would alleviate the pain for a week and enable

28   her to focus on doing other things.  AR 47.  Afterwards, the pain would inevitably return.  *Id.*

1    During this time, she was under the care of Dr. MacMaster, an orthopedic surgeon. AR 49. She

2    saw him about once every three weeks. *Id.* He administered her examinations and cortisone

3    injections. *Id.* He agreed with her that she should not be working. AR 50. Her injury afflicted both

4    of her shoulders. AR 50. In terms of her daily routine, she would walk out to the front of the house

5    for about 10-15 minutes. *Id.* She would also drive occasionally (about twice a week) to a local store

6    about a mile away to buy small amounts of household items. AR 51. On her drive to the local store,

7    she would not have to make any turns that would require her to rotate her neck. *Id.* She did not feel

8    comfortable driving for longer periods of time down unfamiliar stretches of road. AR 52.

9    Since becoming Dr. MacMaster's client, she had seen him approximately four to five times. *Id.*

10    Prior to seeing Dr. MacMaster, she was seeing Dr. Hanus, a chiropractor, for two to three months.

11    AR 52-53. Dr. Hanus referred her to Dr. MacMaster when he realized he could not help her. AR

12    53. She would feel pain whether she moved her head from side-to-side or up-and-down. *Id.* She

13    first felt this pain on or around May 30, 2008. *Id.* But she first noticed that her neck was

14    problematic back in October 2006. *Id.* Around mid-2007, prior to retiring, her employer

15    implemented an ergonomic evaluation to help modify her work area. AR 54. Her employer lowered

16    her desk and computer monitor to eye level and instructed staff to help carry her files. AR 54-55.

17    But because of staff reductions, she wound up carrying a number of her own files anyway. AR 55.

18    In May 2008, she began to use her leave credits so that she could be physically away from work

19    while still technically employed. AR 55. Prior to that, in April 2008, she was working a reduced

20    schedule (approximately four hours a day). *Id.* She had been working a reduced schedule for most

21    of 2007 while using her leave credits to supplement her earnings. *Id.*

22    She had been taking Atenolol for blood pressure, Ometrizol for acid reflux, and Vicodin as well

23    as cortisone injections for the pain. AR 56. She stopped after receiving 3 cortisone injections

24    because she was not aware that she could receive more. *Id.* She had also been taking Tylenol for

25    Arthritis, an over-the-counter medication, to help manage her pain. AR 57. She had not previously

26    been hospitalized for any medical condition. *Id.* She had never received any arthritis prescription

27    medications. AR 58.

28    Prior to December 10, 2007, she had been off work once or twice, for periods of at least a month

UNITED STATES DISTRICT COURT
For the Northern District of California

1   each, during which she would be resting at home.  AR 58-59.  She was released to go back to work

2   four hours a day, 20 hours a week with the ergonomic changes in place (e.g., computer monitor

3   lowered to eye level, no prolonged positions of the neck, allowed a two-minute break from work for

4   every 20 minutes, etc.).  AR 59.  But the changes did not reduce her pain level.  *Id.*

5   She stopped taking Vicodin since moving to Texas because she started consulting with new

6   doctors.  AR 60.  Her new doctors wanted her to test out the cortisone before prescribing any

7   Vicodin.  *Id.*  Her not taking Vicodin was not an indication that she no longer felt pain.  *Id.*

8   After returning to work, she was on modified work duty up until May 2008.  AR 61.  She was on

9   this modified work schedule for about 6 months.  *Id.*

10  **IV.  VOCATIONAL EXPERT TESTIMONY**

11  Ms. Meloy Kelly, the vocational expert, stated her knowledge of the following facts: Ms. Sutton

12  was closely approaching advanced age at the time of her disability-induced retirement; and she had

13  completed a lengthy career with the State of California as a personnel administrator, titled under the

14  Dictionary of Occupational Titles as Number 166.167-018, which the DOT defined at the sedentary

15  exertional category skill level of 7S7.  AR 70.  She testified that a hypothetical individual – of the

16  claimant's age, education, and work history; similarly limited to carrying 20 pounds occasionally

17  and 10 pounds frequently; able to sit, stand, and walk for six or eight hours; able to occasionally

18  climb stairs and ramps, but not ladders, ropes, or scaffolds; and similarly unable to crawl – would

19  still be able to perform Ms. Sutton's past work, including occasional overhead reaching.  AR 70-71.

20  Ms. Kelly believed that an employer like Ms. Sutton's would be able to tolerate rest periods of only

21  five minutes per hour for employees similar to Ms. Sutton. AR 71.  Jobs like Ms. Sutton's would

22  likely have a very limited tolerance for absenteeism because of the high demand and skill level

23  involved.  *Id.*  A one-to-two day per month absence would likely interrupt workflow and be

24  problematic for the employer.  AR 71-72.

25  A hypothetical person who suffers from spinal stenosis of the cervical spine and chronic right

26  shoulder bursitis, such that she has deficits with attention and concentration of approximately two

27  minutes every 20 minutes of work (or 6 minutes every hour), would have about 48 minutes of

28  unscheduled breaks in a typical eight-hour work day, which would be problematic for the employer.

1   AR 72-73.  Ms. Sutton performed her job at the sedentary level.  AR 74.  The intermittent lifting

2   would have gone into the higher end of light work.  *Id.*

3   **V. ADMINISTRATIVE FINDINGS**

4       On May 13, 2010, the ALJ applied the sequential evaluative process to find Ms. Sutton not

5   disabled under sections 216(I) and 223(d) of the Social Security Act and, therefore, not entitled to

6   supplemental security income.  AR 19.

7       At step one, the ALJ found Ms. Sutton had not engaged in any substantial gainful activity since

8   May 30, 2008, the alleged onset date of her disability.  AR 14.

9       At step two, the ALJ found Ms. Sutton was, in fact, severely impaired by degenerative disc

10  disease of the cervical/thoracic spine and right shoulder bursitis.  *Id.*  The ALJ noted that Ms.

11  Sutton's other alleged impairments (i.e., reduction in visual acuity due to hyperopia and presbyopia,

12  post-surgical condition of breasts, depressive disorder accompanying her spinal and shoulder

13  impairment, and neuropathy impairment) were either unsupported by the administrative record or so

14  lacking in severity that they did not qualify as impairments.  *Id.*

15      At step three, the ALJ found Ms. Sutton's impairments of degenerative disc disease and right

16  shoulder bursitis not to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404,

17  Subpart P, Appendix 1.  AR 15.

18      The ALJ then determined Ms. Sutton's residual functional capacity in order to assess at steps

19  four and five whether she could perform her past relevant work or any other work considering her

20  age, education, and work experience.  The ALJ found Ms. Sutton to have the residual functional

21  capacity to sustain competitive employment at the light exertional level.  *Id.*  Specifically, the ALJ

22  found Ms. Sutton capable of performing the following: lift/carry 20 pounds occasionally and 10

23  pounds frequently; stand/walk six hours in an eight-hour workday; sit six hours in an eight-hour

24  workday; climb stairs occasionally and ramps without limitation; and perform occasional overhead

25  reaching.  *Id.*

26      In determining her residual functional capacity, the ALJ considered Ms. Sutton's symptoms and

27  their consistency with the objective medical evidence (based on the requirements of 20 C.F.R. §

28  404.1529 and Social Security Rulings 96-4p and 96-7p).  *Id.*  In addition, the ALJ also considered

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1    opinion evidence under 20 C.F.R. § 404.1527 and Social Security Rulings 96-2p, 96-5p, 96-6p and

2    06-3p.  *Id.*  The ALJ followed a two-step analytical process to determine Ms. Sutton's residual

3    functional capacity.  *Id.*  First, the ALJ assessed whether she had a medically-determinable physical

4    or mental impairment that reasonably could be expected to produce her pain and symptoms.  *Id.*

5    Then the ALJ evaluated the intensity, persistence, and limiting effects of her symptoms to determine

6    the extent that they limited her ability to perform basic work activities.  *Id.*  For the second part,

7    whenever Ms. Sutton's statements about the intensity or functionally limiting effects of her pain or

8    other symptoms were unsubstantiated by the objective medical evidence, the ALJ made findings on

9    the credibility of the statements "based on a consideration of the entire record."  *Id.*

10        The ALJ took note that Ms. Sutton alleged the following symptoms: constant severe pain in her

11   neck and shoulders with stiffness; numbness, tingling, and weakness in her upper extremities;

12   inability to turn her neck from side-to-side without severe pain; difficulty moving; and difficulty

13   lifting her arms over her shoulders.  *Id.*  In addition, the ALJ took note of Ms. Sutton's claim that her

14   impairments adversely affected her ability to lift, squat, bend, reach, walk, sit, stair-climb, kneel, and

15   use her hands.  *Id.*  But in citing to various function and exertion reports, the ALJ also noted that Ms.

16   Sutton appeared to provide care to her young daughter; perform some household chores (e.g.,

17   handling dishware and laundry, shopping in stores, and preparing small meals); travel short

18   distances (e.g., drive and walk half miles); and participate in some recreational activities (e.g., read,

19   attend church, and watch television).  AR 16.

20        The ALJ further found the medical evidence confirmed the presence of disabilities and

21   symptoms but were inconclusive as to the extent of their limiting effect on her residual functional

22   capacity.  The ALJ cited to Dr. Bundy's and Dr. Pak's readings of Ms. Sutton's MRI scans to find

23   that she suffered from multilevel degenerative changes in her spine with canal stenosis, cord

24   compression, and varying stages of neural foraminal stenosis, as well as acromioclavicular joint

25   arthropathy and supraspinatus and infraspinatus bursal surface tendinitis.  AR 17.  But the ALJ also

26   noted (1) evaluations conducted by Dr. Perry and Dr. MacMaster that indicated no evidence of

27   radiculopathy, (2) Ms. Sutton's medial and ulnar nerve studies appeared normal, and (3) she

28   demonstrated an ability to undertake a range of physical actions without any apparent distress or

UNITED STATES DISTRICT COURT
For the Northern District of California

pain.  *Id.*  In addition, the ALJ cited Dr. Tobias's psychological evaluation indicating that Ms. Sutton was capable of performing a wide range of physical actions, AR 16; a progress note from Dr. North indicating that Ms. Sutton appeared to exhibit no weaknesses in her limbs or surgical diseases afflicting her neck, *id.*; Dr. Pon's evaluation also indicating that Ms. Sutton was physically capable of performing a wide range of physical actions, AR 16-17; and treating notes from Hanus Chiropractic indicating that improvements in Ms. Sutton's pain management.  AR 17.

After summarizing the evidence in the record, the ALJ found that Ms. Sutton's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; nonetheless, [Ms. Sutton's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [ALJ's] residual functional capacity assessment."  AR 18.  The ALJ found Ms. Sutton's complaints of pain to be incredible because she still was able to perform numerous physical activities, consistent with the medical evaluations that found her within the range of normal functioning.  *Id.*  Moreover, the ALJ noted that Ms. Sutton never visited the emergency room, never took non-narcotic prescription medication, had no history or future plans to receive orthopedic surgery, never used any ambulatory devices, and had no medical opinion of disability from a treating physician.  *Id.*

The ALJ discounted the function statement provided by Ms. Sutton's husband to the extent that it was inconsistent with the objective medical evidence or the physical activities that Ms. Sutton was capable of performing.  *Id.*  The ALJ also discounted Dr. MacMaster's medical evaluation to the extent that it was based on Ms. Sutton's subjective statements about her own pain or similarly inconsistent with the objective medical evidence or Ms. Sutton's alleged participation in various physical activities.  *Id.*

Having determined Ms. Sutton's residual functional capacity, the ALJ proceeded to steps four and five of the sequential evaluative process.  At step four, the ALJ accepted the vocational expert's testimony to find Ms. Sutton capable of performing her past relevant as a personnel specialist.  AR 18-19.  The ALJ found the work did not require her to perform work-related activities precluded by her residual functional capacity.  *Id.*  The ALJ was silent with respect to step five because it did not have to reach it.  *See* 20 C.F.R. 404.1520(a)(4)(10); *see generally* AR 14-19.

UNITED STATES DISTRICT COURT
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**DISCUSSION**

Ms. Sutton challenges the ALJ's decision on four grounds: (1) the ALJ erred by finding Ms. Sutton's residual functional capacity to be normal without substantial evidence; (2) the ALJ erred by considering the vocational expert's responses to incomplete hypothetical questions; (3) the ALJ erred by rejecting Ms. Sutton's subjective complaints as incredible; and (4) upon wrongly denying Ms. Sutton's disability benefits claim at step four, the Commissioner failed to satisfy his burden at step five to identify alternate positions that Ms. Sutton could perform during the period in question. Pl.'s Mot., ECF No. 21 at 7-8.

**I. MS. SUTTON'S RESIDUAL FUNCTIONAL CAPACITY**

Ms. Sutton challenges the ALJ's finding that she had the residual functional capacity to sustain employment at the light exertional level. *Id.* at 19. She argues that the ALJ failed to adequately consider the medical opinions of Dr. Mazzara, Dr. Troy, Dr. Young Me Choi Do, Dr. Bundy, Dr. Pak, Dr. Perry, and Dr. MacMaster. *Id.* at 19-21. Moreover, she argues that the ALJ improperly discounted Dr. MacMaster's medical opinion as expressed in his physician's medical source statement, dated September 22, 2009. *Id.* at 22-27. The court find that the administrative record as a whole contained substantial evidence to justify the ALJ's assessment that Ms. Sutton had the residual functional capacity to sustain competitive employment at the light exertional level.

*A. Medical Evidence*

An assessment of a claimant's residual functional capacity is made based upon all of the relevant evidence in the claimant's case record. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). When the medical signs or laboratory findings show that the claimant has a medically determinable impairment that could reasonably be expected to produce the symptoms, the ALJ then must evaluate the intensity and persistence of those symptoms to determine their effects on the claimant's capacity for work. 20 C.F.R. § 404.1529(c)(1). The ALJ must evaluate those symptoms by considering the objective medical evidence (e.g., evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, etc.). 20 C.F.R. § 404.1529(c)(2). An ALJ must assess a claimant's residual functional capacity separately from his or her impairment as "[t]he mere existence of an impairment

1    is insufficient proof of a disability." *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) (citing

2    *Sample v. Schweiker*, 694 F.2d 639, 642-43 (9th Cir. 1982)); *see Castillo v. Astrue*, 2012 WL

3    5835691 at *5 (N.D. Cal. Nov. 16, 2012) ("[t]he mere existence of a condition or limitation is not

4    per se disabling. . . . Disability is established only if there is proof of related functional loss that

5    prevents a claimant from working.") (internal citations omitted).  In *Matthews*, the Ninth Circuit

6    held that, absent a conclusion that claimant is precluded from engaging in "previous work" or other

7    "substantial gainful work," a medical opinion establishes only impairment, and not disability.

8    *Matthews*, 10 F.2d at 680.  The court rejected the claimant's assertion that his doctor's medical

9    findings of back impairment and resulting physical limitations was "equivalent to or indicate

10   disability." *Id.*

11       The court must affirm the ALJ's decision where it is supported by substantial evidence and

12   determined pursuant to the correct legal standards.  *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th

13   Cir. 2001) (citing to *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999)).  Though "substantial

14   evidence" must be more than a mere scintilla, it need not amount to a preponderance.  *Id.* (citing to

15   *Tackett*, 180 F.3d at 1098).  The court may neither affirm nor deny the ALJ's decision simply by

16   isolating a specific quantum of supporting evidence.  *See id.*  Rather, the court must consider the

17   record as a whole, "weighing both evidence that supports and evidence that detracts" from the

18   Commissioner's conclusion.  *Id.* (internal quotation marks and citation omitted).

19       In the present case, Ms. Sutton challenges the ALJ's failure to consider evidence that she

20   believes argued against the ALJ's finding of a residual functional capacity to sustain employment at

21   the light exertional level.  Pl.'s Mot., ECF No. 21 at 19.  Ms. Sutton identifies the following

22   evidence: Dr. Mazzara's radiology report dated October 31, 2006; Dr. Troy's letters and reports

23   dated April 27, 2007, August 2, 2007, November 5, 2007, and February 6, 2008; Dr. Lim's report

24   dated December 19, 2007; Dr. Young Me Choi Do in a patient consultation dated July 22, 2008; Dr.

25   Bundy's and Dr. Pak's readings of an MRI study, dated March 9, 2009; Dr. Perry's letter dated

26   March 10, 2009; and Dr. MacMaster's reports dated March 9, 2009, March 16, 2009, and September

27   22, 2009.  *Id.* at 19-21.

28       The Commissioner responds that the ALJ's determination of Ms. Sutton's residual functional

UNITED STATES DISTRICT COURT
For the Northern District of California

1    capacity was correct.  Def.'s Mot., ECF No. 23 at 3.  The Commissioner cites to the following

2    evidence as support for the Commissioner's decision: Dr. Pon's residual functional capacity

3    assessment dated October 14, 2008;  Dr. Nguyen's assessment dated November 3, 2008; Dr.

4    Tobias's mental status disability evaluation dated November 10, 2008; and Dr. Walk's

5    psychological evaluation dated November 12, 2008.  *Id.* at 3-5.  The Commissioner further argues

6    that the medical evidence as a whole supported the ALJ's finding; that Dr. MacMaster's findings of

7    Ms. Sutton's right upper extremity on examination were not part of a functional limitation

8    assessment; and that Dr. MacMaster did not render an opinion as to Ms. Sutton's functional abilities.

9    *Id.* at 4-5.

10        In a radiology report dated October 31, 2006, Dr. Mazzara found Ms. Sutton to exhibit some

11    straightening of the curvature in her spine.  AR 456.  There was also narrowing of the intervertebral

12    space and the intervertebral neural foramina, especially on the left side at the C6-C7 spinal location.

13    *Id.*  There was also spurring exhibited at all levels.  *Id.*  Based on these findings, Dr. Mazzara

14    concluded that Ms. Sutton suffered from degenerative disc disease at C6-C7.  *Id.*  The ALJ did not

15    cite to this medical evidence in its discussion of Ms. Sutton's residual functional capacity, *see*

16    *generally* AR 11-19; nonetheless, he did not need to because this evidence establishes only the fact

17    of Ms. Sutton's impairments and not her functional limitations.  *See Matthews*, 10 F.3d at 680;

18    *Castillo*, 2012 WL 5835691 at *5.

19        In a letter dated April 27, 2007, Dr. Troy wrote that physical examination revealed Ms. Sutton to

20    have normal axial alignment in her head and neck; physiologic deep tendon reflexes; normal contour

21    in her shoulders without evidence of atrophy or fasciculation; excellent motor strength and

22    symmetrical range of motion; and no evidence of irritability, instability, or impingement.  AR 414.

23    Dr. Troy also noted that physical examination showed Ms. Sutton suffered from tenderness in her

24    right trapezius and symmetrical limitation in lateral flexion with significant asymmetric limitation of

25    rotation.  *Id.*  Dr. Troy concluded that Ms. Sutton suffered from cervical osteoarthritis and possibly

26    also a herniated cervical disc.  *Id.* at 416.  The ALJ did not consider this evidence in its residual

27    functional capacity assessment.  *See generally* AR 11-19.  To the extent that this evidence

28    establishes some functional limitation on Ms. Sutton's mobility, it is inconclusive: while Dr. Troy

1   found Ms. Sutton to evidence some experience of pain and limited rotation, he also found her range

2   of motion to be within normal limits, that she exhibited excellent motor strength, and her range of

3   motion to be symmetrical.  *See* AR 414.

4        In a supplemental report dated August 2, 2007, Dr. Troy explained that x-ray images of Ms.

5   Sutton's cervical spine revealed significant multilevel degenerative changes in her spine.  AR

6   316-17.  At C6-C7, there was marked intervetebral disc-space narrowing, almost complete loss of

7   the disc space, and mild foraminal encroachment.  *Id.*  There was also significant foraminal

8   encroachment caused by the spurring and enlargement of the superior facet of C6.  *Id.*  Furthermore,

9   he noted significant multilevel degenerative changes with anterior spurring at C2-C6.  *Id.*  This

10  evidence establishes only the fact of Ms. Sutton's degenerative impairments, and not the functional

11  limitations that result from her impairments, *see id.*; therefore, the ALJ's failure to consider this

12  evidence in its residual functional capacity analysis was not improper.  *See Matthews*, 10 F.3d at

13  680; *Castillo*, 2012 WL 5835691 at *5.

14       In a letter dated November 5, 2007, Dr. Troy wrote that Ms. Sutton appeared to suffer advanced

15  degenerative changes to her cervical spine, including collapse of the C6-C7 intervetebral disc space.

16  AR 405-06.  Furthermore, he anticipated that an MRI study of her cervical spine would reveal her

17  symptoms to be attributable to radiculopathy and consistent with foraminal narrowing and nerve root

18  compression.  *Id.*  He believed her condition would be symptomatic at work as it would while she

19  participates in any other activity.  *Id.*  The ALJ did not consider this evidence in determining Ms.

20  Sutton's residual functional capacity, *see generally* AR 11-19; nevertheless, he did not need to do so

21  because this evidence highlights only the fact of Ms. Sutton's degenerative impairments, and does

22  not establish the functional limitations that result from her impairments.  *See Matthews*, 10 F.3d at

23  680; *Castillo*, 2012 WL 5835691 at *5.  Dr. Troy's opinion that Ms. Sutton could be just as

24  symptomatic at work as she could while participating in any other activity could have some bearing

25  on the ALJ's determination of Ms. Sutton's functional limitations while at work.  Nevertheless, the

26  ALJ's failure to consider this evidence was not outcome-determinative as the weight of the medical

27  evidence nevertheless justifies the ALJ's residual functional capacity determination.

28       In a report dated December 19, 2007, Dr. Lim diagnosed Ms. Sutton with degenerative disc

UNITED STATES DISTRICT COURT
For the Northern District of California

disease at multiple locations in her cervical spine, with the greatest level of severity situated at

C3-C4.  AR 505.  Dr. Lim further explained his diagnosis by noting multiple instances of disc

bulging, foraminal narrowing, and vertebral ridging throughout her spine.  *Id.*  Again, the ALJ did

not consider this evidence, but she did not have to because it merely establishes the severity of Ms.

Sutton's degenerative impairments and not the functional limitations that result from those

impairments.  *Id.*; *see Matthews*, 10 F.3d at 680; *Castillo*, 2012 WL 5835691 at *5.

    In a report dated February 26, 2008, Dr. Troy found on physical examination, that Ms. Sutton's

cervical motion showed restriction, particularly with extension and about 50% loss of lateral flexion

and 50% loss of left lateral rotation.  AR 365-66.  He further found that axial compression did not

elicit any discomfort, but the Spurling Test did test positive bilaterally with pain radiating to her

trapezius.  *Id.*  Sensation was slightly decreased in her fingers and along the radial border of her

right arm.  *Id.*  Her deep tendon reflexes were symmetrical, her biceps and triceps were physiologic,

and her finger flexors were slightly depressed.  *Id.*  Manual motor testing revealed that there was no

evidence of focal motor weakness.  *Id.*  As a result, Dr. Troy diagnosed Ms. Sutton with advanced

degenerative spondylosis and multilevel cervical disc disease.  *Id.* at 367.  Because this evidence

establishes that Ms. Sutton suffered some loss of motion that could be symptomatic at work, *see id.*,

this evidence could have had some bearing on the ALJ's residual functional capacity determination.

The ALJ's omission of this evidence in its discussion of Ms. Sutton's residual functional capacity

limitations was not a material error, however, as the general narrative of the medical evidence

justifies the ALJ's finding.

    In progress notes dated July 22, 2008, Dr. Young Me Choi Do found on physical examination

that Ms. Sutton's left shoulder range of motion evidenced a decrease in abduction or flexion on

account of pain.  AR 494.  Dr. Choi Do found that Ms. Sutton suffered an impingement in her left

shoulder, and injected her with 40 mg of "depo" and 7 cc of lidocaine to treat the pain.  *Id.*  Because

this evidence shows that Ms. Sutton suffered some decrease in abduction or flexion, *see id.*, which

could have some bearing on her exertional and manipulative limitations, the ALJ should likewise

have considered this evidence in its discussion.  Despite her failure to consider this evidence, the

ALJ nevertheless arrived at a proper conclusion regarding Ms. Sutton's residual functional capacity.

In progress notes dated March 9, 2009 and March 16, 2009, Dr. Benzel MacMaster found on examination of Ms. Sutton's axial skeleton that she had no abnormal curvatures or deformities; nevertheless, she appeared to suffer pain and tenderness at C4-C7 spinal locations and her C-spine ROM appeared to exhibit moderate restrictions in range of motion on all planes but with no masses, spasms, or specific trigger points in her cervical spine musculature. AR 579-80, 576-77. Her right upper extremity revealed no asymmetry, ecchymosis, soft tissue swelling, or deformity of the shoulder girdle, but her shoulder ROM did exhibit moderate restriction in flexion, abduction, and internal and external rotation motions. AR 579-80, 576-77. Her left upper extremity exhibited diminished sensation across her forearm, thumb, index finger, and half of her middle finger, as well as diminished tendon reflexes in her triceps. AR 579-80, 576-77. Examination of Ms. Sutton's neuro/psych system revealed that she was alert and oriented to time, place, and person; she was not in apparent distress or exhibiting abnormal speech; and her gait and stance were normal. AR 579-80, 576-77. There was no objective evidence of cervical radiculopathy or plexopathy. AR 579-80, 576-77. Her median and ulnar nerve studies appeared normal. AR 579-80, 576-77. As a result, Dr. MacMaster diagnosed Ms. Sutton with chronic and exacerbated multilevel spinal stenosis in her cervical region and exacerbated bursitis in her right shoulder region. AR 581, 577. Review of the administrative decision shows that the ALJ properly described Dr. MacMaster's findings to the extent that they might bear on Ms. Sutton's residual functional capacity, *see* AR 17. Therefore, the ALJ properly considered this evidence.

In an MRI study dated March 9, 2009, Dr. Bundy found Ms. Sutton's cervical spine to exhibit, in various locations and to varying degrees, foraminal stenosis, central canal stenosis, spondylosis, and degenerative disc disease. AR 559-61. In his reading of the same study, Dr. Pak found Ms. Sutton to suffer from degenerative arthrosis of her AC joint and supraspinatus and infraspinatus bursal surface tendinitis. AR 564-65. The ALJ summarized these MRI readings in its discussion of Ms. Sutton's residual functional capacity and, therefore, properly considered this evidence. *See* AR 17.

In her findings dated March 10, 2009, Dr. Perry stated that on physical examination, she found Ms. Sutton's neck to show a limited range of motion. AR 569. Nevertheless, she was unable to elicit specific findings with respect to neck pain. *Id.* Dr. Perry also noted that Ms. Sutton appeared

UNITED STATES DISTRICT COURT
For the Northern District of California

to have spotty decreased sensation in her hands, but nothing that followed a specific dermatomal distribution.  *Id.*  She also found Ms. Sutton's motor exam to reveal some make/break changes, but also nothing that followed a specific dermatomal pattern.  *Id.*  After performing an electrodiagnostics examination,  Dr. Perry found that Ms. Sutton's EMG/nerve conduction study of her left upper extremity and her median and ulnar nerve conduction studies were normal, and found no conclusive evidence of cervical radiculopathy or plexopathy and no evidence of peripheral entrapment.  AR 569-570.  The ALJ considered only Dr. Perry's electrodiagnostic findings and not her physical examination findings which indicate that Ms. Sutton suffered some limitation in her range of motion.  *See* AR 17.  Because these findings bear on Ms. Sutton's ability to perform at work, the ALJ should have considered this evidence in determining her functional limitations.

In his physician's medical source statement dated September 22, 2009, Dr. MacMaster diagnosed Ms. Sutton with spinal stenosis in her cervical region and chronic exacerbated right shoulder bursitis.  AR 592-93.  He found her to exhibit chronic cervical pain and shoulder pain.  *Id.*  He believed this pain was consistent with her C-spine MRI scan showing multilevel foraminal stenosis at various locations in her spine.  *Id.*  The ALJ's discussion of Dr. MacMaster's statement does not accurately reflect these findings, *see* AR 18; nevertheless, as discussed below, these findings even if properly considered, would still have been insufficient to establish Ms. Sutton's functional limitations.  *See Matthews*, 10 F.3d at 680; *Castillo*, 2012 WL 5835691 at *5.

### B. Dr. MacMaster's Physician's Medical Source Statement

Ms. Sutton argues that the ALJ committed judicial error by improperly discounting the medical opinion of Dr. MacMaster, Ms. Sutton's treating physician,[2] and according undue weight to the

---

[2] In *Ghokassian v. Shalala*, 41 F.3d 1300 (9th Cir. 1994), the Ninth Circuit found that the claimant shared a "treatment" relationship with physician where claimant consulted only with the physician and on two occasions within the 14-month period preceding the ALJ hearing; the physician prescribed medication, at claimant's request, to treat his medical condition; and physician and claimant held each other out to be patient and treating physician, respectively.  *Id.* at 1303.  The ALJ generally assigns "more weight to opinions from [claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [claimant's] medical impairments(s) . . . ."  20 C.F.R. § 404.1527(c)(2); *see also Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  The weight accorded to a treating physician's opinion is positively correlated with the length, frequency, nature, and extent of the treatment relationship.  20

1   opinion of Dr. Pon, a mere examining physician. Pl.'s Mot., ECF No. 21 at 22-27. The

2   Commissioner responds that the ALJ had a reasonably adequate basis for arriving at its conclusion

3   in light of countervailing medical opinions offered by Dr. Pon and Dr. Nguyen. Def.'s Mot., ECF

4   No. 23 at 3-6. The Commissioner argued that the ALJ properly discounted Dr. MacMaster's opinion

5   in determining Ms. Sutton's physical functional limitations because Dr. MacMaster expressly

6   disclaimed having performed any functional evaluation of Ms. Sutton. *Id.* Furthermore, the

7   Commissioner argues that the ALJ also properly discounted Dr. MacMaster's opinion, to the extent

8   it draws any conclusion about Ms. Sutton's psychological functional limitations, because any such

9   conclusion would constitute a legal finding of disability that only the Commissioner can offer. *Id.*

10  Moreover, the probative value of such a conclusion would depend on Dr. MacMaster's expertise in

11  psychological health, in which he has none. *Id.*

12      When determining whether a claimant is disabled, the ALJ must consider each medical opinion

13  in the record together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *Zamora v.*

14  *Astrue*, No. C 09-3273 JF, 2010 WL 3814179, at *3 (N.D. Cal. Sept. 27, 2010). "By rule, the Social

15  Security Administration favors the opinion of a treating physician over non-treating physicians."

16  *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527). "The opinion of a

17  treating physician is given deference because 'he is employed to cure and has a greater opportunity

18  to know and observe the patient as an individual.'" *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169

19  F.3d 595, 600 (9th Cir. 1999) (citing *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)).

20  "However, the opinion of the treating physician is not necessarily conclusive as to either the

21  physical condition or the ultimate issue of disability." *Id.* (citing *Magallanes v. Bowen*, 881 F.2d

22  747, 751 (9th Cir. 1989) and *Rodriguez v. Bowen*, 876 F.2d 759, 761-62 & n.7 (9th Cir. 1989)).

23

24  C.F.R. § 404.1527(c)(2). An ALJ may reject the medical opinion of a treating physician upon "clear

25  and convincing" reasons. *Lester*, 81 F.3d at 830. In *Magallanes v. Bowen*, 881 F.2d 747 (9th Cir.
    1989), the Ninth Circuit affirmed the ALJ's rejection of a treating physician's medical opinion after

26  finding it was outweighed by contrary laboratory and clinical results, contrary findings from
    examining physicians, and the claimant's own testimony. *Id.* at 751-55. In the present case, the

27  Commissioner does not challenge Ms. Sutton's assertion that Dr. MacMaster is her "treating

28  physician." *See generally* Def's Mot., ECF No. 23. Therefore, the court proceeds on the assumption
    that Dr. MacMaster is in fact Ms. Sutton's treating physician.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    "If a treating physician's opinion is 'well-supported by medically acceptable clinical and

2    laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the]

3    case record, [it will be given] controlling weight.'"  *Orn*, 495 F.3d at 631(quoting 20 C.F.R. §

4    404.1527(d)(2)).  "If a treating physician's opinion is not given 'controlling weight' because it is not

5    'well-supported' or because it is inconsistent with other substantial evidence in the record, the

6    [Social Security] Administration considers specified factors in determining the weight it will be

7    given."  *Id.*  "Those factors include the '[l]ength of the treatment relationship and the frequency of

8    examination' by the treating physician; and the 'nature and extent of the treatment relationship'

9    between the patient and the treating physician."  *Id.* (citing 20 C.F.R. § 404.1527(d)(2)(i)-(ii)).

10    "Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the

11    treating physician, include the amount of relevant evidence that supports the opinion and the quality

12    of the explanation provided; the consistency of the medical opinion with the record as a whole; the

13    specialty of the physician providing the opinion; and '[o]ther factors' such as the degree of

14    understanding a physician has of the [Social Security] Administration's 'disability programs and

15    their evidentiary requirements' and the degree of his or her familiarity with other information in the

16    case record."  *Id.* (citing 20 C.F.R. § 404.1527(d)(3)-(6)).  Nonetheless, even if the treating

17    physician's opinion is not entitled to controlling weight, it is still entitled to deference.  *See id.* at

18    632 (citing SSR 96-02p at 4 (Cum. Ed. 1996)).  Indeed, "[i]n many cases, a treating source's medical

19    opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test

20    for controlling weight."  SR 96-02p at 4 (Cum. Ed. 1996).

21    "Generally, the opinions of examining physicians are afforded more weight than those of

22    non-examining physicians, and the opinions of examining non-treating physicians are afforded less

23    weight than those of treating physicians."  *Orn*, 495 F.3d at 630 (citing 20 C.F.R. §

24    404.1527(d)(1)-(2)); *see also* 20 C.F.R. § 404.1527(d).  Accordingly, "[i]n conjunction with the

25    relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an

26    ALJ's weighing of medical evidence."  *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir.

27    2008) (citing 20 C.F.R. § 404.1527).  "'To reject [the] uncontradicted opinion of a treating or

28    examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial

1   evidence.'" *Id.* (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (citing *Lester v.*

2   *Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995)) (emphasis added).  "'If a treating or examining

3   doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing

4   specific and legitimate reasons that are supported by substantial evidence.'" *Id.* (quoting *Bayliss*,

5   427 F.3d at 1216) (emphasis added).  Opinions of non-examining doctors alone cannot provide

6   substantial evidence to justify rejecting either a treating or examining physician's opinion.  *See*

7   *Morgan*, 169 F.3d at 602.  An ALJ may rely partially on the statements of non-examining doctors to

8   the extent that independent evidence in the record supports those statements.  *Id.*  Moreover, the

9   "weight afforded a non-examining physician's testimony depends 'on the degree to which they

10  provide supporting explanations for their opinions.'"  *See Ryan*, 528 F.3d at 1201 (quoting 20 C.F.R.

11  § 404.1527(d)(3)).

12      Ms. Sutton argues that the ALJ committed judicial error by improperly discounting the opinion

13  of Dr. MacMaster, Ms. Sutton's treating physician.  Pl.'s Mot., ECF No. 21 at 22-27.  In its opinion,

14  the ALJ stated that it assigned "little weight" to Dr. MacMaster's medical opinion, as expressed in

15  his physician's medical source statement dated September 22, 2009, "because the physician only

16  saw the claimant three times and it appears the assessment [was] based primarily on the claimant's

17  subjective statements." AR 18.  Moreover, the statement was inconsistent with the evidence from

18  examinations and from Ms. Sutton's documented ability to perform some activities of daily living.

19  *Id.*  While the limited duration of the treatment relationship and the infrequency of the examinations

20  argue against assigning Dr. MacMaster's opinion controlling weight, the ALJ neglected to consider

21  the following countervailing factors that argue in favor of assigning additional weight to Dr.

22  MacMaster's medical opinion: Dr. MacMaster used well-supported clinical and laboratory

23  diagnostic techniques to evaluate Ms. Sutton, including different kinds of physical examinations and

24  an MRI study of her spine; his progress notes contained a comprehensive survey of his findings; and

25  his impression that Ms. Sutton suffered from chronic spinal stenosis in her cervical region and

26  exacerbated bursitis in her right shoulder was consistent with the preponderance of the objective

27  medical evidence in the record that also shows Ms. Sutton to suffer from degenerative impairments

28  in her cervical spine and shoulders.  *See id.*; *see also* AR 575-81, 597-99.  The fact that Ms. Sutton

UNITED STATES DISTRICT COURT
For the Northern District of California

1  demonstrated the capacity to perform certain tasks on examination or in her daily life speaks to her

2  functional limitations or lack thereof, and not to the fact of impairment that Dr. MacMaster

3  established in his findings.  Consequently, the ALJ should have considered Dr. MacMaster's

4  medical opinion in establishing the fact of Ms. Sutton's degenerative impairments

5      While the ALJ could have assigned Dr. MacMaster's opinion additional weight, the court finds

6  that the ALJ need not credit Dr. MacMaster's opinion in evaluating Ms. Sutton's functional

7  limitations.  In the September 22, 2009 assessment, Dr. MacMaster checked a box that stated Ms.

8  Sutton's experience of pain was constant and severe enough to interfere with her attention and

9  concentration needed to perform even simple tasks on a typical workday.  AR 592-93.  It is not clear

10  from the record how Dr. MacMaster justified this conclusion as records of his three patient meetings

11  with Ms. Sutton suggested only that Ms. Sutton self-reported feeling pain.  *See* AR 575-81, 597-99.

12  Furthermore, he never tested the effect of her pain on her functionality through any physical,

13  psychological, or functional examination.  *See* AR 575-81, 597-99.

14      In the bottom half of that same September 22, 2009 assessment, Dr. MacMaster handwrote that

15  he will answer questions about Ms. Sutton's functional limitations "only according to examination,"

16  and because he does not test for functional limitations, he could not offer an opinion about Ms.

17  Sutton's functionality.  AR 592-93.  Dr. MacMaster's handwritten statement appears to reflect his

18  intent to remain silent with respect to Ms. Sutton's functional limitations.[3]  *See* AR 592-93.  But

19  even if Dr. MacMaster did intend to opine on how Ms. Sutton's pain interfered with her ability to

20  perform work tasks, the court cannot assign it controlling weight because it is conclusory and

21  unsupported by his own examinations of Ms. Sutton's functional limitations.  *See* AR 575-81,

22  597-99.  Furthermore, there exists specific and legitimate reasons supported by substantial evidence

23  in the record to discount Dr. MacMaster's comment.  As far as the court can tell, that evidence

24  includes the following physical residual functional capacity assessments: examining physician Dr.

25

26      [3]  Ms. Sutton cites to *Sprague v. Bowen*, 812 F.2d 1226 (9th Cir. 1987) for the proposition
that the ALJ may not undermine a treating physician's medical opinion of disability on the basis that
27  an examining physician had a different opinion.  *Id.* at 1230.  This precedent does not bind the
present case as Dr. MacMaster, Ms. Sutton's treating physician, does not appear to have rendered a
28  medical opinion about her disability.  *See* AR 592-93.

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Pon's assessment dated October 14, 2008,[4] reviewing physician Dr. Nguyen's assessment dated

2   November 3, 2008,[5] and reviewing physician Dr. McCrary's assessment dated March 3, 2009.[6]   In

3   addition, the psychological residual functional capacity assessments provided by Dr. Tobias[7] and Dr.

4   Walk[8] also constitute substantial evidence against finding that Ms. Sutton's pain prevented her from

5   working.   These assessments constitute substantial evidence to reject Dr. MacMaster's unsupported

6   conclusion of disability.

7       For the reasons stated above, the court finds that the administrative record as a whole contained

8   substantial evidence to justify the ALJ's assessment that Ms. Sutton had the residual functional

9   capacity to sustain competitive employment at the light exertional level.   Though Ms. Sutton

10  identified some evidence that suggested the possibility of a lower residual functional capacity than

11  that found by the ALJ – Dr. Troy's medical findings in his report dated February 26, 2008; Dr.

12  Young Me Choi Do's medical findings in progress notes dated July 22, 2008; and Dr. Perry's

13  findings dated March 10, 2009 – these three discrete pieces of evidence are insufficient to

14

15      [4] Dr. Pon found Ms. Sutton able to sit, stand, walk, stoop occasionally, crouch, kneel, squat,
    stair-climb, ladder-climb, crawl, perform bilateral pushing and pulling with her arms, exercise

16  arm/hand control, perform bilateral pushing with her legs, exercise leg/foot control, lift and carry 10
    pounds frequently, lift and carry 20 pounds occasionally, reach bilaterally, and perform gross and

17  fine manipulative tasks with both hands.  AR 46-62.

18
        [5] Dr. Nguyen found Ms. Sutton able to balance, stoop, kneel, crouch, and crawl occasionally;

19  stair-climb and ramp-climb occasionally; sit, stand, or walk with normal breaks for a total of about 6
    hours in an 8 hour workday; lift or carry 10 pounds frequently and 20 pounds occasionally; and

20  handle, finger, and feel. AR 519-23.  Dr. Nguyen did note, however, that Ms. Sutton's ability to
    reach in all directions (including overhead) was limited.  *Id.*

21

22      [6] Dr. McCrary arrived at similar findings as Dr. Nguyen with respect to Ms. Sutton's
    exertional, postural, and manipulative limitations.  AR 539-46.  Dr. McCrary did note that Ms.

23  Sutton appeared to be limited in her ability to reach overhead; nevertheless, she found the totality of
    Ms. Sutton's alleged limitations to be not as severe as alleged.  *Id.*

24

25      [7] In a mental status disability evaluation, Dr. Tobias found Ms. Sutton to be within normal on
    a number of evaluative criteria.  AR 510-12.  As a result, Dr. Tobias concluded that Ms. Sutton's

26  main obstacle to adequate work performance was her medical condition, and not her psychological
    condition.  AR 513.

27

28      [8] In a psychological evaluation, Dr. Walk found that Ms. Sutton had no medically
    determinable impairment from a psychological standpoint. AR 535-37.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    undermine the generally-consistent narrative in the record that Ms. Sutton had the residual

2    functional capacity found.  Because the court must respect the ALJ's findings absent substantial

3    evidence to the contrary, the court must affirm the ALJ's residual functional capacity assessment.

4    **II.  VOCATIONAL EXPERT'S RESPONSES TO HYPOTHETICAL QUESTIONS**

5         If a claimant shows that he cannot return to his previous work, the Commissioner must show that

6    the claimant can do other kinds of work.  *Magallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir. 1989).

7    The Commissioner may carry this burden by eliciting the testimony of a vocational expert in

8    response to a hypothetical that sets out all the limitations and restrictions of the claimant.  *Id.*

9    Although the hypothetical may be based on evidence that is disputed, the assumptions in the

10   hypothetical must be supported by the record.  *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir.

11   1984).  The ALJ must include only those limitations supported by substantial evidence.  *Osenbrock*

12   *v. Apfel*, 240 F.3d 1157, 1163-65 (9th Cir. 2001).  Conversely, the ALJ cannot disregard those

13   limitations properly supported by substantial evidence.  *Robbins v. Social Sec. Admin.*, 466 F.3d

14   880, 886 (9th Cir. 2006).

15        In *Andrews v. Shalala*, 53 F.3d 1035 (9th Cir. 1995), the Ninth Circuit held that the ALJ's

16   hypothetical questions posed by an ALJ must consider all of the claimant's limitations as supported

17   by the evidentiary record.  There, the claimant received a residual functional capacity assessment in

18   which he was rated as "not significantly limited" in 14 of 20 categories and "moderately limited" in

19   5 categories.  *Id.* at 1043-44.  The ALJ posed a hypothetical question to the vocational expert that

20   accounted only for the claimant's social limitations, which were found "not significantly limited,"

21   and not for any of the 5 categories in which he was found to be "moderately limited."  *Id.*  Because

22   the hypothetical question did not consider the claimant's moderate limitations, as established in his

23   RFC assessment, the court found the question insufficient to satisfy the Commissioner's burden to

24   identify specific jobs in the national economy that the claimant could actually perform.  *Id.* at 1044.

25        In the present case, Ms. Sutton argues that the ALJ improperly considered testimony that the

26   vocational expert provided in response to two incomplete hypothetical questions.  Pl.'s Mot., ECF

27   No. 21 at 27-28.  In the first instance, the ALJ asked the vocational expert whether a hypothetical

28   individual of Ms. Sutton's age, education, and work history; similarly limited to carrying 20 pounds

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1    occasionally and 10 pounds frequently; and like Ms. Sutton, also able to sit, stand, and walk for 6 of

2    8 hours; able to occasionally climb stairs and ramps, but not ladders, ropes or scaffolds; and unable

3    to crawl, would be able to perform Ms. Sutton's past work.  AR 70-71.  The vocational expert

4    answered that this hypothetical individual could perform Ms. Sutton's past work.  *Id.*  In the second

5    instance, the ALJ asked whether this same hypothetical individual, with the added limitation of

6    being able to perform only limited overhead reaching, would still be able to perform Ms. Sutton's

7    past work.  *Id.*  The vocational expert again answered that this hypothetical individual could perform

8    Ms. Sutton's past work.  *Id.*  Ms. Sutton argues that the ALJ's consideration of this testimony was

9    improper because the hypothetical questions failed to account for Dr. MacMaster's finding, as stated

10   in his physician's medical source statement dated September 22, 2009, that Ms. Sutton's experience

11   of pain was constant and severe enough to interfere with her attention and concentration on even

12   simple work tasks.  Pl.'s Mot., ECF No. 21 at 27-28.  Commissioner responds that the hypothetical

13   question posed by the ALJ was proper as it included all of Ms. Sutton's limitations as found in the

14   ALJ's residual functional capacity determination, which was supported by substantial evidence.

15   Def.'s Mot., ECF No. 23 at 9-10.

16       As explained above, the court finds Ms. Sutton's alleged limitation to be unsupported by and

17   inconsistent with the prevailing medical evidence in the record.  Unlike in *Andrews*, where the Ninth

18   Circuit invalidated the ALJ's hypothetical question because it failed to consider claimant's

19   limitations as established in his residual functional capacity assessment, *see Andrews*, 53 F.3d at

20   1043-44, here the alleged limitation is unsupported because Dr. MacMaster neither performed nor

21   reviewed any physical, psychological, or functional evaluation to determine the extent that Ms.

22   Sutton's pain level would interfere with her ability to perform her job.  *See generally* AR 575-81,

23   597-99.  Moreover, the conclusion is inconsistent with the prevailing medical evidence that showed

24   Ms. Sutton should have had no difficulty performing her job: examining physician Dr. Pon's and

25   reviewing physicians Dr. Nguyen's and Dr. McCrary's findings that Ms. Sutton was physically

26   functionally able to perform her job (*see* AR 460-62, 519-23, 540-44); and reviewing psychologists

27   Dr. Tobias's and Dr. Walk's findings that Ms. Sutton was psychologically functionally able to

28   perform her job as well (*see* AR 510-513, 524-34).  Because the assertion that Ms. Sutton suffered

1    pain sufficient to interfere with her ability to perform her job is not supported by substantial

2    evidence in the record, the ALJ did not have to incorporate this limitation into its hypothetical

3    question.

4    **III.   MS. SUTTON'S CREDIBILITY**

5        To determine whether a claimant's testimony about subjective pain or symptoms is credible, the

6    ALJ must engage in a two-step analysis. *See Vasquez*, 572 F.3d at 591 (citing *Lingenfelter v.*

7    *Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)).  First, the ALJ must determine whether the

8    claimant has presented objective medical evidence of an underlying impairment that reasonably

9    could be expected to produce the alleged pain or other symptoms. *See Lingenfelter*, 504 F.3d at

10   1036.  Second, if the claimant meets the first test and there is no evidence of malingering, the ALJ

11   can reject the claimant's testimony about the severity of his symptoms only by offering specific,

12   clear, and convincing reasons for doing so. *Id.*  When the ALJ finds a claimant's testimony not

13   reliable, the ALJ must "specifically identify what testimony is credible and what testimony

14   undermines the claimant's complaints." *Morgan*, 169 F.3d at 499.  This court defers to the ALJ's

15   credibility determination if it is supported by substantial evidence in the record. *See Thomas v.*

16   *Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002).

17       In *Burch v. Barnhart*, 400 F.3d 676 (9th Cir. 2005), the Ninth Circuit stated that the ALJ may

18   consider the following factors to determine the claimant's credibility: "1. The nature, location, onset,

19   duration, frequency, radiation, and intensity of any pain; 2. Precipitating and aggravating factors

20   (e.g., movement, activity, environmental conditions); 3. Type, dosage, effectiveness, and adverse

21   side-effects of any pain medication; 4. Treatment, other than medication, for relief of pain; 5.

22   Functional restrictions; and 6. The claimant's daily activities." *Id.* at 680.  The Ninth Circuit found

23   that the ALJ rightly rejected the claimant's credibility because of the following: (1) claimant was

24   engaged in a number of daily living activities that involved transferrable skills; (2) the objective

25   medical findings evidenced only mild lower back pain, no disc herniation, and no nerve root

26   impingement; and (3) claimant had not sought any treatment for her alleged pain for a three to four

27   month period, including surgery, physical therapy, or home exercises. *Id.* 681.  For these reasons,

28   the court upheld the ALJ's rejection of claimant's credibility.

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

ORDER (C 11-04088 LB)

1    In the present case, Ms. Sutton challenges the ALJ's discrediting of her testimony to be

2    improper.  Pl.'s Mot., ECF No. 21 at 29-31.  Applying the above-mentioned two-step analysis, Ms.

3    Sutton presented objective medical evidence that she suffered from degenerative impairments in her

4    cervical spine and shoulder.  *Id.*  The Commissioner responds that the ALJ's conclusion regarding

5    Ms. Sutton's testimony was proper: the record did not support the degree of pain and limitations that

6    Ms. Sutton alleged (citing to *Moncado v. Chater*, 60 F.3d 521 (9th Cir. 1995)); there were

7    inconsistencies within Ms. Sutton's testimony and between her testimony and the evidence (citing

8    again to *Moncado*); Ms. Sutton received only a conservative treatment regimen (citing to *Osenbrock

9    v. Apfel*, 240 F.3d 1157 (9th Cir. 2001)); and Ms. Sutton's daily activities were inconsistent with her

10   alleged disability (citing to *Burch v. Barnhart*, 400 F.3d 679 (9th Cir. 2005)).  Def.'s Mot., ECF No.

11   23 at 7-9.  This case law is distinguishable from the present case.  Unlike the plaintiff in *Moncado*,

12   Ms. Sutton appears to rely regularly on pain medication and has been consistently limited in her

13   daily living activities since her impairment.  *See Moncado*, 60 F.3d at 524.  And unlike in *Osenbrock*

14   where the ALJ had abundant evidence to disbelieve claimant, the ALJ here did not have a similar

15   basis for discrediting Ms. Sutton's testimony: Ms. Sutton's evaluations revealed some physical

16   abnormalities; Ms. Sutton underwent various medical consultations over the course of three years;

17   and there is no evidence in the record that Ms. Sutton ever exhibited a lack of "motivation to do

18   more."  *See Osenbrock*, 240 F.3d at 1165-66.  Moreover, unlike in *Burch* where the ALJ properly

19   discredited claimant's testimony on the basis that claimant was "able to care for her own personal

20   needs, cook, clean and shop. . . ." in the present case, Ms. Sutton exhibits severe physical limitations

21   in performing these same daily living activities.  *See Burch*, 400 F.3d at 680-81.

22   Contrary to the ALJ's credibility evaluation, the record shows that Ms. Sutton's degenerative

23   impairments could reasonably be expected to produce her pain.  For example, from April 27, 2010

24   through February 26, 2008, Dr. Troy repeatedly stated that, from physical examination and review of

25   Ms. Sutton's MRI scans, he believed Ms. Sutton suffered from advanced cervical degenerative

26   disease and the pain and other symptoms resulting from her disease could be symptomatic,

27   regardless of the activity.  AR 316-17, 361-67, 405-06, 409-16.  Furthermore, the administrative

28   record does not contain any evidence that Ms. Sutton had been malingering.  Therefore, the ALJ

UNITED STATES DISTRICT COURT
For the Northern District of California

1    must assert "specific, clear, and convincing reasons" for finding Ms. Sutton's testimony to be not

2    fully credible.

3        First, the ALJ found that Ms. Sutton's testimony that her functional limitations prevented her

4    from working was inconsistent with her normal physical examination findings. AR 18. In a

5    physical functional assessment dated October 14, 2008, Dr. Pon found on physical examination that

6    there was no hard, objective evidence of any cervical nerve root impingement that could cause her

7    pain. AR 460-62. Dr. Pon also found that Ms. Sutton experienced no observable restriction in

8    performing various physical motions. *Id.* Furthermore, in physical functional assessments dated

9    November 3, 2008 and March 3, 2009, reviewing physicians Dr. Nguyen and Dr. McCrary

10   respectively found Ms. Sutton's exertional, postural, and manipulative limitations to allow for a

11   range of physical activity. AR 519-23, 540-44. Dr. McCrary further stated that Ms. Sutton's alleged

12   limitations did not appear consistent with her functional limitations. AR 544. For these reasons, the

13   ALJ had an adequate basis for finding Ms. Sutton's testimony to be not fully credible.

14       Second, the ALJ found Ms. Sutton's testimony of limited functional capacity to be inconsistent

15   with the fact that she had been able to perform numerous activities in her daily life. AR 18. As

16   detailed in her function report dated September 3, 2008, after the onset of her degenerative

17   impairments, Ms. Sutton still was able to prepare her own meals (namely cereal and sandwiches),

18   drive a car to shop for household items in stores, and talk regularly on the phone and attend church

19   twice a week, among other activities. AR 187-193. Ms. Sutton described her impairments as

20   adversely affecting her ability to lift, squat, bend, reach, walk, sit, or stair-climb, as well as her

21   memory, her ability to complete tasks, her concentration, and the use of her hands. *Id.* Ms. Sutton's

22   alleged limited functionality had also prevented her from providing care to her family, from

23   performing household chores, and from engaging in sustained physical activity (e.g., walking long

24   distances). *Id.* In her exertion report also dated September 3, 2008, Ms. Sutton admitted that she

25   still was able to walk short distances, lift kitchen utensils and grocery bags weighing 2-3 pounds or

26   lighter about 2 or 3 times a week, carry small cleaning products and laundered clothes back to their

27   drawers about 3 times a week, place dishes in the dishwasher, and drive an automatic car for

28   approximately 30 minutes at a time. AR 204-06. Ms. Sutton also described that she was no longer

1   able to perform car maintenance or yard work in addition to the numerous household chores that she

2   was able to perform prior to her disability.  *Id.*  The ALJ does not explain how Ms. Sutton's ability

3   to perform these discrete physical activities of daily living is necessarily inconsistent with her

4   alleged work performance limitations.  *See generally* AR 11-19.  Ms. Sutton testified without

5   contradiction that her job requires her to lift files anywhere between 10-20 pounds and to frequently

6   reach overhead to access file cabinets.  AR 43.  Furthermore, as the vocational expert testified, Ms.

7   Sutton's taking a 2 minute break for every 20 minutes worked (amounting to 48 minutes of

8   unscheduled breaks in a typical 8 hour work day) would be problematic for her employer.  AR

9   72-73.  The fact that Ms. Sutton might still have been able to perform some daily life activities (e.g.,

10  carrying light-weight objects for a short duration) does not demonstrate that she necessarily had the

11  ability to perform sustained physical activity as required in her previous job.  Therefore, this was not

12  an adequate basis to discredit Ms. Sutton's testimony.

13       Third, the ALJ found Ms. Sutton's testimony that her alleged limitations prevented her from

14  working to be inconsistent with the fact that she had never treated her pain by taking non-narcotic

15  prescription medication, visiting the emergency room, receiving or planning to receive neck or

16  shoulder surgery, or using or planning to use ambulatory devices.  AR 18.  This opinion does not

17  account for the fact that Ms. Sutton had received multiple injections of Celestone in her

18  subacromial/subdeltoid bursa from Dr. MacMaster.  AR 576, 599.  In addition, Ms. Sutton had

19  previously taken Nortriptyline twice a night (for pain and depression), Etodolac twice a day (for

20  inflammation), and Hydrocodone/Vicodine (for severe pain).  AR 206.  Furthermore, Ms. Sutton had

21  also consulted with a professional chiropractor to help her manage her pain without resort to surgery

22  or narcotics.  AR 550-555.  The fact that Ms. Sutton has not required such invasive treatments as

23  neck or shoulder surgery or immediate medical assistance in the form of emergency care does not

24  adequately show that Ms. Sutton could not have suffered the alleged limitations or that her

25  testimony should be discredited.  Moreover, Ms. Sutton does not appear to require the use of

26  ambulatory aids because the effect of her degenerative impairments occurs on her shoulders and

27  cervical spine.  Therefore, these reasons were not adequate bases for discrediting Ms. Sutton's

28  testimony.

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Fourth, the ALJ found Ms. Sutton's testimony that she had worked in April 2008 and then ran

2   out of accrued leave until her retirement to be inaccurate because payroll records do not reflect this

3   order of events.  AR 18.  Furthermore, the ALJ found the payroll records not to support Ms. Sutton's

4   testimony regarding how much time she took off work.  *Id.*  Nevertheless, Ms. Sutton already

5   indicated in her testimony that she was not confident she knew the precise dates of when she worked

6   full time, when she worked on modified duty, and when she stopped working entirely.  AR 61-69.

7   The fact that Ms. Sutton's testimony with respect to those dates has been subsequently disproven

8   through payroll records does not suggest that Ms. Sutton's credibility should be questioned as a

9   result.  Furthermore, even if adequate to discredit Ms. Sutton's testimony, the payroll records should

10   be accepted only to discredit her testimony with respect to her recollection of her employment dates

11   and work schedule, and not with respect to that part of her testimony concerning her alleged

12   limitations.

13   Fifth, the ALJ found that Ms. Sutton's failure to procure a medical opinion of disability from her

14   treating physician to be indicative that she is not disabled.  AR 18.  From March 9, 2009 to

15   September 18, 2009, Ms. Sutton consulted with treating orthopedic surgeon Dr. MacMaster who

16   found, on physical examination and review of Ms. Sutton's MRI scans, that Ms. Sutton suffered

17   from chronic and stable multilevel spinal stenosis in her cervical region and exacerbated bursitis in

18   her right shoulder region.  AR 577, 599.  In his physician's medical source statement dated

19   September 22, 2009, Dr. MacMaster further explained that, because he does not test for functional

20   limitations, he could not offer an opinion about Ms. Sutton's functionality.  AR 592-94.  Ms.

21   Sutton's failure to obtain a medical opinion of disability from her treating physician, therefore,

22   cannot support the inference that Ms. Sutton was in fact not disabled.  It can only be taken for the

23   inference that Ms. Sutton's treating physician does not perform functional limitations tests necessary

24   to evaluate one's disability status.  For this reason, the ALJ cannot discredit Ms. Sutton's testimony

25   on this basis.

26   The administrative record as a whole shows that Ms. Sutton's accounting of her condition has

27   been consistent not only in treatment but also in her testimony.  Her medical records confirm the

28   degenerative impairments that she suffers in her cervical spine and shoulders.  The ALJ's

UNITED STATES DISTRICT COURT
For the Northern District of California

ORDER (C 11-04088 LB)

46

UNITED STATES DISTRICT COURT
For the Northern District of California

1  discounting of Ms. Sutton's reports of her condition are inconsistent with the generally-consistent

2  narrative in the entire record of Ms. Sutton's condition.  The court does not find substantial evidence

3  in the record to justify the ALJ's credibility determinations.

4  **IV.  IDENTIFICATION OF JOBS IN THE NATIONAL ECONOMY**

5       If the ALJ finds that claimant was disabled or not disabled at any particular step, the ALJ will

6  make its determination or decision and will not proceed to the next step.  *See* 20 C.F.R. § 404.1520.

7  Therefore, the ALJ will proceed to the next analytical step only when it cannot find the claimant to

8  be disabled or not disabled.  *Id.*  "The claimant bears the burden of proving steps one through four,

9  consistent with the general rule that '[a]t all times, the burden is on the claimant to establish [her]

10  entitlement to disability insurance benefits.'"  *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007)

11  (citing *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998)).  Once the claimant satisfies her burden

12  of proof at steps one through four, the burden then shifts to the Commissioner at the fifth step to

13  show that the claimant may perform other gainful activity.  This burden shifts only after the ALJ

14  finds the claimant to establish her prima facie case.  *Id.*

15       In the present case, the ALJ found that Ms. Sutton was capable of performing her past relevant

16  work as a personnel specialist, and therefore did not require the Commissioner to provide additional

17  evidence demonstrating that other work exists in significant numbers in the national economy for

18  Ms. Sutton to perform.  AR 18-19.  Ms. Sutton asserts that the ALJ's failure to proceed to step five

19  is judicial error.  Pl.'s Mot., ECF No. 21 at 28.  The Commissioner responds that the ALJ was

20  correct in not proceeding to step five since it properly found Ms. Sutton failed to establish her prima

21  facie case of disability under steps one through four.  Def.'s Mot., ECF No. 23 at 10.  The court

22  finds the ALJ's conclusion that Ms. Sutton was unable to establish her prima facie case at steps one

23  through four was based in part on an improper rejection of Ms. Sutton's credibility.

24                                        **VI.  CONCLUSION**

25       The court **GRANTS IN PART** and **DENIES IN PART** Ms. Sutton's motion for summary

26  judgment, **GRANTS IN PART** and **DENIES IN PART** the Commissioner's cross-motion for

27  summary judgement, and **REMANDS** the case for reconsideration of Ms. Sutton's credibility at step

28  four, and identification of jobs in the national economy at step five, if applicable.  This disposes of

ORDER (C 11-04088 LB)

1    ECF Nos. 21 and 23.

2       **IT IS SO ORDERED.**

3    Dated: March 22, 2013

4                          LAUREL BEELER
                                United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
For the Northern District of California